| iCALOGERO,* Chief Justice, Pro Tem.
Pamela Beth Block was murdered in the course of an attempted armed robbery on August 28, 1991. An Orleans Parish Grand Jury returned an indictment charging Melvin Green with first degree murder. LSA-R.S. 14:30. Green pleaded not guilty and was tried by jury on July 21-24, 1992. The petit jury found Green guilty as charged, but was unable to reach a unanimous decision following the penalty phase of the capital trial. Accordingly, the trial court sentenced Green to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.
On appeal the court of appeal reversed the conviction and vacated Green’s sentence. State v. Green, 92-2700 (La.App. 4 Cir. 3/15/94), 634 So.2d 503. It concluded that the trial court had erred in admitting a confession made by Green to homicide detectives shortly after his arrest because “defendant’s mental retardation” rendered him incapable of making a “knowing and intelligent” waiver of his Miranda rights. In addition, the court |2found that the prosecutor during voir dire exercised peremptory strikes against two prospective jurors to exclude them because of their race, in violation of Batson v. Ken *276 tucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The court of appeal ordered Green retried and barred further use of his confession in the trial court.
We granted a writ to review the decision of the court of appeal. State v. Green, 94-0887 (La. 1/6/95), 648 So.2d 908. Based upon our review of the record and the applicable law, we reverse the decision of the court of appeal and reinstate the district court’s conviction and sentence of the defendant.
I. Facts and Procedural Background
At approximately 9:00pm on August 28, 1991, Pamela Beth Block and her husband were walking to their car, which was parked in front of their home in the 4800 block of Carondelet Street in New Orleans. As the Blocks were about to enter their vehicle, three black males, all on bicycles, approached them. One of the three pulled a pistol on the Blocks and demanded that they “give it up.” Mrs. Block panicked and jumped into her ear through the driver’s side door. The gunman thereupon fired a single shot through the front passenger side window, striking Mrs. Block in the neck. While the three men fled on their bicycles, Mr. Block, along with several neighbors who had responded to the sound of the gunshot, attempted unsuccessfully to revive Mrs. Block. Unfortunately, she died forty-five (45) minutes later.
At around 3:00pm the following day, August 29, 1991, an unidentified informant called the “Crimestoppers” hotline to provide the police with information about the shooting of Mrs. Block. Based upon information obtained in a face-to-face interview with this informant,[1] homicide detectives prepared arrest warrants designating Melvin Green, Darrell Claiborne, and an individual known as “Duck” (later identified as George McClow) as the prime Rsuspects in the Block murder.[2] In an attempt to seize the murder weapon search warrants were prepared for the residences of Green and Claiborne.
At 7:56pm on the evening of August 29, at approximately the same time as the search warrant was being executed on his residence, Green was arrested at the home of his girlfriend’s mother. Following his arrest Homicide Detective John Ronquillo informed Green of his Miranda rights. Green acknowledged that he understood his rights and declined to waive them at that time.
Homicide detectives Marco Demma and Norman McCord assumed custody of Green at the place of his arrest and transported him to the Homicide Division Office of the New Orleans Police Department. While in transit to the police station the detectives again read Green his Miranda rights, but did not attempt to obtain any statement from him.
Once they had arrived at the stationhouse, the detectives again read Green his rights and asked him to sign a “rights of arrestee” form which contained, along with a transcription of the Miranda litany, a clause providing for the arrestee’s waiver of his Miranda rights. Green complied with the detectives’ request and signed the form at 8:46pm.
Detectives Catalonotto, Demma, and McCord then began questioning Green about his involvement in the Block murder. At around 9:30pm, about an hour and a half after his arrest, Green made a statement in which he admitted being at the scene of the crime along with Claiborne and McClow. Green asserted, however, that he had not been involved in the attempt to rob the Blocks, and claimed that it was Claiborne who had shot Mrs. Block. The detectives had Green repeat his statement so that it might be | recorded on an audio cassette tape.[3] At the outset of the recording Green *277 was Mimndized again and expressly waived his rights.
The detectives continued questioning Green because the “Crimestoppers” informant who had earlier contacted the police had indicated that it was Green, and not Claiborne, who had shot Mrs. Block. In the course of his first statement the detectives had shown Green several photographs seized during the search of Green’s residence, including a Polaroid photograph of Green holding a handgun which matched a description of the weapon used in the Block murder. During his first statement Green maintained that although the photographs depicted him holding the weapon, the gun belonged not to him but to Claiborne.
In the course of subsequent questioning, however, perhaps prompted by the detectives’ assertion that Green’s girlfriend had told the police that the gun was his, Green recanted his prior story and admitted that the gun was indeed his own. Green also admitted that he had discarded the gun the day after the shooting in a weeded area near a warehouse at the corner of St. Louis and Robertson streets. At the prompting of Detective Demma, Green volunteered to show the detectives where the gun was located.
The detectives, accompanied by Green, immediately left the police station and travelled to the 1500 block of St. Louis Street. The police were initially unable, because of the poor lighting conditions, to locate the weapon in the area indicated by Green. Because of their difficulties, the detectives summoned the Fire Department to provide remote lighting on the scene. A Dan Wesson .357 magnum revolver, later confirmed by ballistics analysis to be|5the gun which fired the bullet that killed Mrs. Block, was found within moments after the Fire Department emergency vehicle arrived and illuminated the area.
As they were departing the scene, Detective Demma resumed his questioning of Green. Demma, while praising Green for cooperating with the detectives, also pointed out that Green had admitted that he owned the murder weapon and had led the detectives to it. Demma again asked Green whether it had been he, and not Claiborne, who shot Mrs. Block. In response to Dem-ma’s questioning, Green confessed to having been the gunman. At 11:39pm, back at the police station, Green was Mimndized yet again. He repeated his confession to the murder of Mrs. Block. This statement, along with the reading of the Miranda rights and accompanying waiver of those rights, was also recorded on an audio cassette tape.
Green filed a number of pretrial motions, among which was a motion to suppress his confession. A hearing on this motion was held on March 9, 1992, and Detective McCord testified regarding the circumstances surrounding Green’s two tape-recorded statements, including the second, his confession. Detective McCord testified that basically Green understood his Miranda rights, waived those rights a number of times, and gave several statements which were not compelled or coerced by the detectives in any way. The defense called no witnesses and submitted its motion without argument. The trial court denied the motion to suppress.
The case was set for trial on July 21, 1992. The day before the trial began the defense filed a motion to re-open the motion to suppress, offering as grounds for the motion new evidence concerning Green’s capacity to knowingly and intelligently waive his Miranda rights.[4] Just before trial the court *278 allowed the defense to present its evidence regarding Green’s alleged diminished mental capacity. After hearing testimony from a |6forensic psychologist, Dr. Marc Zimmerman, the trial court declined to reconsider its earlier ruling denying the motion to suppress.
Following the trial court’s ruling on the defense’s eleventh hour motions, the process of jury selection began. After six panels of prospective jurors from the venire had been subjected to voir dire and both sides had exhausted their allotment of peremptory challenges, a twelve-member jury was finally selected. The racial composition of the jury was eight (8) white members and four (4) black members.
After the jury had been selected and sequestered, the defense made a number of objections, including a Batson challenge.[5] Specifically, the defense observed that the prosecutor had exercised peremptory strikes on eleven (11) black prospective jurors and only one white prospective juror, and alleged that in doing so the prosecutor had acted with discriminatory intent, striking the black prospective jurors on the basis of their race. The trial court ordered the prosecutor to provide a race-neutral explanation for each peremptory strike made against a black juror, and after hearing the prosecutor’s reasons the trial court overruled the Batson objection.
The guilt phase of Melvin Green’s capital trial lasted for three days. The most telling evidence against Green was the eyewitness identification by the victim’s husband, Tommy Block, marking Green as the murderer of his wife, Green’s gun and the ballistics evidence tying it to the murder, and of course Green’s confession. In relation to the confession, the State presented the testimony of Detectives Catalonotto and Demma and played for the jury both of Green’s recorded statements. The jury was also presented with individual copies of the court-approved transcripts of those recordings.
The defense attempted to undermine the credibility of the |7State’s case by developing, through cross-examination during the State’s case-in-chief, the theory that a separate trio of juvenile offenders had perpetrated the crime. See Notes 16, 22 infra. However, the defense itself presented no evidence. After a brief deliberation the jury returned a verdict finding Green guilty of first degree murder.
On the next day, July 24, 1992, the jury returned for the penalty phase of Green’s trial. The State essentially resubmitted the evidence presented during the guilt phase, and also offered evidence of prior offenses, adjudicated and unadjudicated, committed by Green. The defense presented evidence regarding Green’s diminished mental capacity, including further testimony by Dr. Zimmerman, and testimony from family members and friends. The jury was unable to reach a unanimous verdict recommending the death penalty, and so on August 19, 1992, the trial court sentenced Green to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.
The court of appeal reversed Green’s conviction and vacated his sentence, finding that Green’s confession should not have been admitted into evidence and that the defense’s Batson challenge had merit. Exercising our supervisory jurisdiction, we now review these determinations.
II. The Defendant’s Confession
The court of appeal rested its ruling (that the trial court had erred in not excluding Green’s confession) solely upon the expert testimony of Dr. Marc Zimmerman, the forensic psychologist who testified at the hearing on defendant’s motion to reopen his motion to suppress.[6] Specifically, the court of appeal found that “[gjiven the uncontra-dicted testimony of Dr. Zimmerman estab *279 lishing defendant’s mental retardation and Ms brain dysfunction, we cannot find that the defendant made a knowing and intelligent waiver of his constitutional rights.” Green, supra, 634 So.2d at 508. It is this finding of the court of appeal, that Melvin Green was at the Istime of his confession mentally incapable of understanding and consequently giving a knowing and intelligent waiver of his Miranda rights, which we now scrutinize.
A. Was Defendant’s Confession Voluntary?
The trial court found, and the court of appeal did not dispute, that the defendant’s confession was a voluntary one. Before a criminal defendant’s confession may be admitted into evidence, the State has the burden of proving beyond a reasonable doubt that the confession was freely and voluntarily made.[7] The voluntariness requirement, which antedates the Miranda rule, is a component of the “fundamental fairness” which is guaranteed by the due process clause of the Fourteenth Amendment. Oregon v. Elstad, 470 U.S. 298, 304, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985) (listing cases).
In cases, such as this one, which involve allegations of diminished mental capacity, “although the defendant bears the burden of proving the existence of any mental abnormality which | airtight render his confession per se involuntary, in the absence of such a showing the State retains the ultimate burden of proving beyond a reasonable doubt that the confession was voluntary.” State v. Brooks, 92-3331, Slip. Op. P. 12 (La. 1/17/95), 648 So.2d 366, 373. See also State v. Napier, 385 So.2d 776 (La.1980). In all cases, regardless of the applicable burden of proof, courts look to the “totality of the circumstances” surrounding a confession to determine its voluntariness. See Withrow v. Williams, — U.S. -, -, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993), re’hg denied — U.S. -, 113 S.Ct. 3066, 125 L.Ed.2d 748 (1993) (listing factors relevant to voluntariness inquiry); Schneckloth v. Busta-monte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (same).
The only issue presented to us by the opinion of the court of appeal, however, concerns the defendant’s ability to comprehend his Miranda rights. We have noted in the past that in cases involving mental retardation the question of a confession’s voluntariness often “becomes enmeshed in the related, but distinct, question of the knowing and intelligent nature” of the defendant’s Miranda waiver. Brooks, supra, at P. 12, 648 So.2d at 373, citing State v. Lindsey, 404 So.2d 466, 472 (La.1981) (citations omitted). However, the current posture of this case makes it unnecessary for us to engage in an extensive discussion of the voluntariness issue. Because our review of the record reveals no reason to disturb the lower courts’ *280 findings regarding the voluntariness of Green’s confession, we affirm the lower courts’ judgment that Green’s confession was voluntarily made and proceed to our discussion of Green’s Miranda waiver.
B. Did Defendant Make a Knowing and Intelligent Waiver of His Miranda Rights?
i. General Principles
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), re’hg denied, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966), the United States Supreme Court declared that a condition precedent to obtaining a statement admissible in court from a suspect in police custody is that the suspect be informed that he liphas the right to remain silent and to consult with an attorney. Miranda also made it clear that for such a statement to be admissible it must be made with a knowing and intelligent waiver of those rights. Miranda, supra, at 475, 86 S.Ct. at 1602. In other words, for a statement which is the product of custodial interrogation to be entered into evidence against a criminal defendant, at the time the statement is made the defendant must understand that he is entitled to certain protections under the law and nevertheless decide to speak.
Even when a defendant has not expressly invoked his rights under Miranda,[8] “[t]he courts must presume that a defendant did not waive his rights.” North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). Furthermore, it is well-settled that a “heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.” Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980). When, as in this case, a defendant has expressly waived his Miranda rights, the question becomes “whether the purported waiver was knowing and intelligent ... under the totality of the circumstances.” Abadie, supra, 612 So.2d at 5, hiquoting Oregon v. Bradshaw, 462 U.S. 1039, 1044 — 46, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). This “totality of the circumstances” includes “the particular facts and circumstances surrounding the ease, including the background, experience, and conduct of the accused.” Solern v. Stumes, 465 U.S. 638, 647, 104 S.Ct. 1338, 1344, 79 L.Ed.2d 579 (1984), quoting Butler, supra, 441 U.S. at 374-375, 99 S.Ct. at 1757-1759. See also State v. Wilson, 467 So.2d 503 (La. 1985), cert, denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985); re’hg denied, 474 U.S. 1027, 106 S.Ct. 585, 88 L.Ed.2d 567 (1985) (diminished intellectual capacity of defendant only a factor to be considered in determining whether Miranda waiver knowing and intelligent).
In reviewing the correctness of a trial judge’s ruling on a motion to suppress a confession, “we are not limited to the evidence adduced at the hearing(s) on this motion, but rather may consider all pertinent evidence adduced at trial.” State v. Brooks, 92-3331, Slip Op. P. 10 (La. 1/17/95), 648 So.2d 366, 372, citing State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La.1979) (listing *281 cases). We examine this evidence in order to discern whether the testimony of the State’s witnesses, when viewed in light of the entire record, was sufficient to sustain the State’s “heavy burden” of proving a knowing and intelligent waiver. We do not review the record de novo, however; as we have often stated in the past, because the evaluation of witness credibility often plays such a large part in the context of a motion to suppress a confession, reviewing courts should defer to the finding of the trial judge unless his finding is not adequately supported by reliable evidence. Brooks, supra, at 11, 648 So.2d at 372; State v. Nuccio, 454 So.2d 93, 100 (La. 1984); State v. Thornton, 351 So.2d 480, 484 (La.1977).
ii. Did the State Meet Its Burden of Proof?
The State presented the testimony of Detective McCord during the first motion to suppress, and Detectives Catalonotto and Demma during Green’s trial. All of these detectives were experienced detectives, having each spent a number of years in the Homicide | ^Division. The detectives consistently testified that Green was Mirandized on a number of occasions and that at no time did he articulate or in any other way evidence any lack of comprehension of his rights to remain silent or to have an attorney present. Contrast State ex rel. White v. State, 606 So.2d 787 (La.1992) (inconsistent testimony of interrogating officers regarding defendant’s Miranda waiver rendered their testimony incredible). Furthermore, in addition to his multiple verbal waivers of his Miranda rights, prior to making his first tape-recorded statement Green signed a “rights of arres-tee” form which included a clause providing for a waiver of his rights.[9]
In addition, there is the “testimony” of Melvin Green himself through the medium of the two tape-recorded statements which were played in the trial court. These recordings clearly indicate that Green was read his rights prior to each recorded statement, and that prior to the second statement Detective Demma repeated the Miranda warnings twice, pointedly inquiring whether Green understood these rights. See State v. Nicholas, 319 So.2d 365 (La.1975) (police officer’s careful explanation of Mira'iida rights to retarded defendant factor in determining if waiver knowing and intelligent). On each occasion Green expressly waived his rights, choosing to talk to the police officers rather than to remain silent.
The only evidence presented in rebuttal to the State’s proof was the testimony of Dr. Zimmerman. Dr. Zimmerman, who was qualified as an expert in forensic psychology, testified that he spent approximately nine (9) hours with Green, during which time he interviewed Green and administered a battery of psychological tests.[10] Zimmerman found Green’s Intelligence Quotient (Weschler) | i3to be around 65, making him “mildly retarded” but “educable.”[11] Zimmerman placed *282 Green’s “mental age” at around ten (10) years old, and diagnosed Green as suffering from “brain dysfunction.” [12]
Discussing the parameters of Green’s “brain dysfunction,” Zimmerman stated that the regions of Green’s brain most impaired were “those that are most associated with academic abilities and with his ability to process information, his intellectual abilities.” In particular, Zimmerman found Green’s “concepts” and “receptive speech,” i.e. “the ability to understand what is said to an individual,” to be “impaired.”
As part of the psychological evaluation, Zimmerman had Green read parts of the “rights of arrestee” form, specifically the parts addressing the rights that he was giving up. After perceiving that | i4Green was encountering difficulties understanding the form, Zimmerman read parts of the form to Green, purportedly at the same speed as the form had been read to Green by Detective Demma. Zimmerman testified that Green was unable to comprehend the form read at that speed, and that in any case certain key words, such as “privilege” or “waiver,” were not readily understood by Green.
While Zimmerman felt that Green had been unable to understand his Miranda rights as read to him by the interrogating detectives, he did believe that Green could be made to understand his rights “if we changed some of the wording and brought it down to a lower level vocabulary.” Zimmerman also noted that many persons with Green’s mental capacity tended to avow comprehension of things which they in fact failed to understand, for fear of being regarded as different from their peers.
On cross-examination, Zimmerman reiterated that Green was “educable” and could be made to comprehend concepts that he was not, at least initially, readily able to grasp. Zimmerman stated that he was aware that Green had been arrested, and convicted, for criminal activity before, and that he “assumed that the Miranda rights were given to him before.” Zimmerman was unaware that Green had been Boykinized on previous occasions.
The trial court denied the defendant’s pretrial motion to reopen the motion to suppress, refusing to address again the question of whether Green’s waiver of his Miranda rights was knowing and intelligent. The trial judge, specifically noting that Green had been Boykinized twice before and arrested and Mirandized on numerous other occasions, found that “this defendant understood his rights.”
We find that the State met its burden of proof in this case. The trial judge evidently credited the testimony of the police officers, in particular their experienced opinion that Green knew what he was doing when he waived his rights and started to speak. See Withrow, supra, — U.S. at-, 113 S.Ct. at 1755 (“there is little reason to believe that the police today are unable, or even generally unwilling, to satisfy Miranda ⅛ requirements”). | isFurthermore, the progress of Green’s interrogation supports this view of the defendant’s understanding of the interrogation process and his willingness to speak. Green’s first statements to the police represented an attempt to extricate himself from culpability for the murder, and the evolution of his statements over time, in response to new facts presented Green by the detectives, reveals a mental agility and adaptability which cannot be readily associated with the diminished mental capacity found by the *283 court of appeal. Compare State v. Penns, 407 So.2d 678, 681 (La.1981) (defendant’s “claimed retardation does not support a contention of low intelligence ... but rather shows the actions of an intelligent mind seeking to avoid the consequences” of confessing).
This view is bolstered by the extent to which extrinsic facts, ie. the location of the gun, the details of the crime scene, etc., corroborated Green’s ultimate confession.[13] Compare Brooks, supra, 648 So.2d at 375 (extrinsic corroboration is “an additional factor to consider in evaluating the clarity of [a defendant’s] mental processes at the time of his confession”). In so stating, we emphasize that the object of our present inquiry is not the accuracy of Green’s confession, but rather Green’s ability to comprehend his rights to remain silent and have an attorney present during his custodial interrogation. However, when faced with a claim that the defendant’s mental processes are so dysfunctional as to preclude a full understanding of those rights, any facts which shed light upon the functioning of that defendant’s mental processes are relevant and pertinent evidence which the trial court ¡ ieis entitled to consider. See State v. David, 425 So.2d 1241 (La.1983) (circumstances surrounding confession showed defendant in control of his mental faculties despite having consumed alcohol and valium prior to confessing). In this case, Green’s capacity to accurately recall specific details of the crime scene, as well as his attempt to manipulate the progress of the interrogation towards a result favorable to him, are both factors which bear upon the defendant’s ability to understand his Miranda rights. See State v. Simpson, 629 So.2d 468, 473 (La.App. 3 Cir.1993), discussing State v. Daniel, 378 So.2d 1361 (La.1979); State v. Taylor, 490 So.2d 459 (La.App. 4 Cir.1986), unit denied, 496 So.2d 344 (La. 1986).
The trial court also relied in part upon Green’s familiarity with the criminal justice process in finding that he understood exactly what he was giving up when he waived his Miranda rights. Such a reliance was proper, since it cast Green not in the light of a naive young man suddenly injected into a foreign environment, but rather showed that Green’s custodial interrogation was an experience to which he was not a stranger. In addition, insofar as Green’s criminal history, particularly his prior Boykinizations, indicated repeated exposure to his Miranda rights, this familiarity is relevant to the trial judge’s appreciation of Green’s understanding of his rights. Compare State v. Brogdon, 426 So.2d 158 (La.1983), appeal after remand, AS1 So.2d 616 (La.1984), cert, denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985) (fact that defendant was read his Miranda rights five times relevant to voluntariness of his confession).
The defense suggested at oral argument that the trial court’s strong reliance upon the prior Miranda warnings and Boykinizations is impermissible, and cited as support for this proposition State v. McGinnis, 413 So.2d 1307 (La.1981) (on rehearing). In McGin-nis we held, in the context of a prior Boykin-ization, that “[s]imply because the defendant was advised of his privilege against compulsory self-incrimination in a different court on a different charge in 1972 does not assure that the defendant intentionally relinquished a known constitutional right or privilege four years 1 plater in this case.” McGinnis, supra, 413 So.2d at 1311. We went on to note that “[t]o conclude otherwise would be to presume a waiver of a constitutional right by an accused from a silent record, which is clearly impermissible.” Id.
*284 In this case, unlike McGinnis, there is no question as to whether the defendant waived any constitutional rights. Green expressly waived his rights, both by signing the “rights of arrestee” form and orally on a number of occasions, including at the beginning of both tape-recorded statements. Our inquiry involves his understanding of those rights, and consequently whether or not the defendant’s express waiver was a “knowing and intelligent” one. While it may be true that, as defendant argues in brief, “prior history with the criminal judicial system alone has never been considered a valid basis for determining the admissibility of a confession,” that history is certainly a part of the “totality of the circumstances” which a trial judge may consider in determining a defendant’s comprehension of his Miranda rights.
Green’s prior experiences with the criminal justice system are relevant to this inquiry because they show that Green in the past has on numerous occasions been informed of his constitutional rights against self-incrimination and to counsel, both by law enforcement and judicial officers. One of the ways that people are educated and gain an understanding of things is through repetition, through repeated exposure, and it was permissible for the trial court to read Green’s Miranda waivers, in the light of this record, against Green’s criminal history and to conclude that at some point Green became aware that he did not have to respond when questioned by the police and that if he desired an attorney one would be appointed for him.[14] We therefore reject the submission that the number of times that a defendant has been confronted with the hgexercise of his Miranda rights is irrelevant to his understanding them. Rather, Green’s prior experiences are another factor the trial judge legitimately considered in determining whether Green understood his rights prior to waiving them.
iii. Did the Court of Appeal Give Undue Weight to Dr. Zimmerman’s Expert Testimony?
The court of appeal erred in crediting Dr. Zimmerman’s testimony over that of the other evidence presented in this case. We have often noted that expert testimony is not controlling, and that, while helpful, it may be rejected by the trier-of-fact. State v. Lefevre, 419 So.2d 862 (La.1982). In this case, the trial court clearly disagreed with Dr. Zimmerman’s opinion that Green was unable to comprehend his Miranda rights, finding the proffer made by the defense too insubstantial to even warrant reopening the motion to suppress. While the court of appeal’s statement that Dr. Zimmerman’s testimony was “uncontradicted” is in some sense true, the court of appeal improperly ignored the trial judge’s finding that the impact of Dr. Zimmerman’s testimony was insufficient to warrant a reversal of his prior ruling that the State had met its burden of proof for admitting the confession.[15]
WTiile the trial court below was not free to capriciously reject the testimony of Dr. Zimmerman, the record reveals that the trial judge’s disagreement with Dr. Zimmerman’s ultimate opinion that Green was incapable of understanding his Miranda rights is ade *285 quately supported by the record. Dr. Zimmerman testified that hpGreen was only “mildly retarded,” a condition he stated was shared by around “3% of the population.” See State v. Brown, 414 So.2d 689, 696 (La. 1982) (citations omitted) (even “moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights”). Dr. Zimmerman further testified that Green was “educable,” and that he could be “made to understand” such things as his Miranda rights. It is conceivable that the trial court accepted Dr. Zimmerman’s testimony and found that Green’s prior encounters with the criminal justice system, which he specifically referred to in denying the defense’s proffer to reopen the suppression hearing, had constituted just such a “learning process.”
In addition, we note that Dr. Zimmerman testified that he spent only nine (9) hours with Green, much of it occupied in giving the defendant various psychological tests. When testimony such as Dr. Zimmerman’s is considered, it must be remembered that it is not only the reliability of the psychological expert’s opinion which is at stake, but the credibility of the defendant as well. Compare Brooks, supra at 14-15, 648 So.2d at 374 (defendant characterized as a “malingerer ... capable of selectively exercising discernment when it suited his purposes”). Furthermore, the defense presented no hard medical evidence, e.g. psychiatric testimony, skull x-rays, cat scans, electroencephalogram results or other tangible diagnostic evidence of brain damage, to substantiate Dr. Zimmerman’s opinion. Compare Brooks, supra at 14 n. 12, 648 So.2d at 374 n. 12 (psychiatric testimony linking defendant’s alleged mental retardation to birth trauma). The trial court did not abuse his discretion in finding that Green was able to understand his rights, and therefore “knowingly and intelligently” waive them.
iv. Summation of Miranda Issue
For these reasons, we find that the court of appeal erred in concluding that Melvin Green’s waiver of his Miranda rights was not a “knowing and intelligent” one. In particular, the court of appeal erred in reversing the trial court’s finding when there was Rpample evidence in the record to support it. The confession was properly admitted during the guilt phase of Melvin Green’s trial.
III. Defendant’s Batson Challenge
The court of appeal found that the defendant’s Batson challenge had merit because the evidence showed that the prosecutor had exercised peremptory strikes on two black prospective jurors solely because of then-race. We now review this determination by the court of appeal.
As a threshold matter, we note that the State has argued before this Court, both in brief and oral argument, that the defendant’s Batson challenge was untimely, coming after the jury had been empaneled, sworn, and sequestered. The record is unclear on this point, revealing only that the jury had been removed from the courtroom at the time the defendant’s objection was lodged. This Court has previously stated that the proper time to lodge a Batson challenge is prior to the jury being empaneled and sworn, because prior to the swearing of the jury the trial judge can readily correct any constitutional deficiency which might have crept into the jury selection process. State v. Williams, 524 So.2d 746 (La.1988). However, it is unnecessary for us to remand this case to develop the record further since the State waived its right to complain by not objecting to the timeliness of defendant’s Batson challenge. See Note 5, supra.
A. The Lower Court’s Treatment of Defendant’s Batson Challenge
The basis of the defendant’s Batson challenge was that the prosecution had utilized eleven (11) of its arsenal of twelve (12) peremptory strikes to strike black prospective jurors from the panel. The defendant, noting that the jury finally selected was composed of eight (8) white and four (4) black jurors, alleged that the prosecutor had intentionally struck these black prospective jurors based solely upon their race, perhaps fearing that these jurors would be more sympathetic to the defendant, who is also black. The defendant argued that this was exactly the sort of practice forbidden by the Supreme *286 Court’s reading of the equal protection clause in Batson:
121 Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors, so it forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the juror’s race.
Batson, supra, 476 U.S. at 97-98,106 S.Ct. at 1723 (citation omitted).
In response to the defendant’s challenge, the trial court immediately asked the prosecutor to explain his reasons for striking the eleven (11) black prospective jurors. The prosecutor, after taking a moment to consult his notes, proffered reasons to the trial judge for his exercise of peremptory strikes. The trial judge found those explanations acceptable “race-neutral” reasons for striking the black prospective jurors, that the exercise of the peremptory strikes by the prosecutor were not “racially motivated,” and accordingly overruled the defendant’s objection.
The defendant raised the Batson issue in the court of appeal; however, he only challenged the reasons given by the prosecutor for the exercise of six (6) of his peremptory strikes. The court of appeal deferred to the trial court’s ruling as to four (4) of the peremptory strikes, but found that the prosecutor had acted out of improper discriminatory motive in striking two of the black prospective jurors. Based upon our review of the record, we affirm the appellate court’s ruling regarding the four (4) peremptory strikes which it found to have been properly exercised for the reasons stated in the court of appeal’s decision. We now turn to an examination of the facts surrounding the voir dire of the two prospective jurors who were the focus of the court of appeal’s judgment sustaining the defendant’s Batson challenge, Lisa Devezin (Juror No. 110) and Alfred Price (Juror No. 273).
B. The Voir Dire of the Two Prospective Jurors
Lisa Devezin sat on the second panel of prospective jurors to be subjected to voir dire. When asked about whether she could consider voting for the imposition of the death penalty, Devezin stated “I can consider it;” however, she noted that facts sufficient to show first degree murder would not be enough and that |22she would want to hear about the background of the defendant before voting to impose death. Devezin also stated that she thought the death penalty was “severe,” but had the same response when asked about the severity of life imprisonment. These responses regarding the death penalty mirrored those of several other members of her panel.
Later in the course of voir dire, Devezin admitted that Dr. Armond Devezin, who works with juvenile offenders in Orleans Parish Juvenile Court, was her husband’s uncle. Devezin denied ever discussing Dr. Devezin’s work with him. When asked about the prospect of rehabilitating convicted criminals, De-vezin stated that rehabilitation was possible “if they want to change.”
Alfred Price sat on the sixth and final panel of jurors to be subjected to voir dire. Price testified that he was currently employed as a “facility maintenance manager” for the Housing Authority of New Orleans (“HANO”). He also stated that he had not had occasion to work in the Magnolia Project[16] “in the last 20 years.”
*287 In the trial court, the prosecutor offered the following reasons for striking Devezin:
As to Lisa Devezin, No. 110, we have that both her uncle, her husband’s uncle, treats juveniles I think over at Juvenile Detention, and also that she thought or made a comment that she thought death was too severe.[17]
|23The prosecutor also offered fairly detailed reasons to support his exercise of a peremptory strike on Price:
And Alfred Price, No. 273, oh, yes, he is a HANO employee, and there is some— there is some evidence about [the Magnolia Project], While he said he had not been out that way, he was employed with HANO for about 23 years. And he also— he voted in a case in this Court, in “J” Court, the jury voted on a police case of a lesser charge.
We now review the court of appeal’s conclusion that these responses, in the light of this record, are insufficient to resist a Batson challenge.
C. Analysis of Defendant’s Batson Challenge
In Batson the Supreme Court adopted a three-step analysis to determine whether the constitutional rights of prospective jurors have been infringed by impermissible discriminatory practices:[18]
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.[19] Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citations omitted). For a Batson challenge to succeed, it is not enough that a racially discriminatory result be evidenced; rather, that result “must ultimately be traced to a racially discriminatory purpose.” Bat-son, supra, 476 U.S. at 94, 106 S.Ct. I^at 1721, quoting Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). Thus, the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes.
i. The Defendant’s Prima Facie Case
The first step in this process places a burden of production or of “going forward” on the defendant. If the defendant is unable to make out a prima facie case of racial discrimination, then the Batson chal *288 lenge fails and it is not necessary for the prosecutor to articulate “race-neutral” explanations for his strikes. The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.[20] See State v. Collier, 553 So.2d 815 (La.1989); State v. Thompson, 516 So.2d 349 (La.1987), cert, denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), re’hg denied, 488 U.S. 976, 109 S.Ct. 517, 102 L.Ed.2d 551 (1988).
Regarding this first step of the Bat-son analysis, the trial court below did not expressly rule on whether the defendant had made out a prima facie case of purposeful discrimination; rather, he immediately moved to the second step and ordered the prosecutor to justify his use of peremptory strikes against black prospective jurors with race-neutral reasons. The court of appeal found this to be a tacit finding by the trial court that the defense had met its burden of going forward, since “there would have been no need Rsfor the prosecutor to explain his challenges if the trial judge had not found a prima facie case of discrimination.” Green, supra, 634 So.2d at 509. We agree with the court of appeal that a trial judge’s demand that a prosecutor justify his use of peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose. In any case, “[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.” Hernandez, supra, 500 U.S. at 359, 111 S.Ct. at 1866.
ii. The Prosecutor’s “Race-Neutral” Explanation
Once the defendant has made out his prima facie case, the burden of production or going forward shifts to the prosecutor, who must offer a “race-neutral” explanation for his exercise of peremptory strikes. Given the nature of the Batson challenge in this case, the prosecutor was obligated to “come forward with a neutral explanation for challenging black jurors.” Batson, supra, 476 U.S. at 97, 106 S.Ct. at 1723. At this stage of the Batson analysis, the sole burden which falls upon the prosecutor is to articulate reasons for his challenges that are unrelated to race or other suspect classifications; “[t]he second step of this process does not demand an explanation that is persuasive, or even plausible.” Purkett v. Elem, — U.S. -, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Such an explanation, while it “need not rise to the level justifying exercise of a challenge for cause,”[21] must do more than merely affirm the prosecutor’s “good faith in making individual selections.” Id 476 U.S. at 98,106 S.Ct. at 1723-1724.[22]
*289 ^Essentially, the burden on the prosecutor at this stage is to articulate reasons unrelated to impermissible classifications such as race for striking certain prospective jurors. Alternative classifications articulated by the prosecutor to justify his use of peremptory strikes cannot, however, be practically synonymous with the suspect classification allegedly being discriminated against; were we to permit such explanations to satisfy the prosecutor’s burden, we would only be legitimating the practice of impermissible discrimination by proxy or pretext. See supra, — U.S. at --, 114 S.Ct. at 1429 (“gender simply may not serve as a proxy for bias”). It must be remembered that in this, the second stage of the Batson analysis, “the issue is the facial validity of the prosecutor’s explanation; ... [u]nless discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.” Hernandez, supra, 500 U.S. at 363, 111 S.Ct. at 1866.
The reasons given by the prosecutor for striking Devezin and Price are quoted supra. The stated reasons for striking De-vezin were that her husband’s uncle worked with juveniles and that she showed some weakness in her willingness to apply the death penalty. The stated reasons for striking Price were that he worked for HANO for over twenty (20) years and that he previously sat on a jury which “voted on a police case of a lesser charge.”
Without belaboring the point we find that these reasons are facially “race-neutral.” They contain none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny. Compare Hernandez, supra, 500 U.S. at 357, 111 S.Ct. at 1868 (prosecutor’s striking of Spanish-speaking jurors “raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges”). | ¾7⅛ short, we conclude that none of the reasons articulated by the prosecutor, e.g. employment with a governmental agency, are readily associated with the suspect class which is alleged to be the object of the prosecutor’s discriminatory use of peremptory strikes, ie. prospective black jurors.
For these reasons, we find that the State sustained its burden of articulating “race-neutral” reasons for the exercise of its peremptory strikes. Whether these reasons are substantial, and more importantly whether they are substantiated by the record, is a question to be determined in the third stage of the Batson analysis,
iii. Did the Prosecutor Engage in Purposeful Racial Discrimination in Striking Jurors Devezin and Price?
Once the prosecutor has satisfied the second stage of the Batson procedure, “[t]he trial court ... then [has] the duty to determine if the defendant has established purposeful discrimination.” Batson, supra, 476 U.S. at 98, 106 S.Ct. at 1724. In reaching a decision the trial court should examine all of the evidence available; essentially, this involves a comparison of the arguments and facts in support thereof posited in the defendant’s prima facie offering with the “race-neutral” reasons articulated by the prosecutor to determine whether the prosecutor engaged in purposeful discrimination.[23] This comparison must be made in light |28of the *290 record; although reviewing courts owe the trial judge proper deference in assessing the credibility of in-court testimony, we have already stated in this opinion that simple assertions of “good faith” by the prosecutor are insufficient to counter a valid Batson challenge. See Collier, supra, 553 So.2d at 818.
Before we proceed, however, we note that the court of appeal clearly erred in assigning the ultimate burden of persuasion on the question of the existence of purposeful discrimination to the State. In rendering its decision as to jurors Devezin and Price, the court of appeal stated that in both instances “[t]he State did not rebut defendant’s prima facie case of purposeful discrimination.” Green, supra, 634 So.2d at 511. Batson, however, made it clear that the “burden” which shifts to the State after the defendant has made a prima facie showing of purposeful discrimination is a “burden of production;” it is the defendant, as “[t]he party alleging that he has been the victim of intentional discrimination, [who] carries the ultimate burden of persuasion.” Batson, supra, 476 U.S. at 94 n. 18, 106 S.Ct. at 1722 n. 18. Accord, State v. Thompson, 516 So.2d 349, 354 (La.1987), cert, denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); re’hg denied, 488 U.S. 976, 109 S.Ct. 517, 102 L.Ed.2d 551 (1988) (“the ultimate burden of persuasion is on the defendant”). The fact that a defendant has met his initial burden of making a prima facie showing of purposeful discrimination does not mean that the defendant’s arguments and evidence are sufficient to carry his ultimate burden of persuading the trial judge of the existence of such discriminatory intent; rather, a defendant’s pri-ma facie showing only raises a “necessary[24] inference of purposeful discrimination,” an inference which the trial judge is free to accept or reject based upon the credibility of the State’s proffered reasons and how those reasons play against the facts and circumstances surrounding the voir dire. Batson, supra, 476 U.S. at 95, lO6J2.9S.Ct. at 1722.
Thus, the proper inquiry in the final stage of the Batson analysis is not whether the State has disproved the existence of purposeful discrimination suggested by the defendant’s prima facie case; rather, the question is whether the defendant’s proof, when weighed against the prosecutor’s proffered “race-neutral” reasons, is strong enough to persuade the trier-of-faet that such discriminatory intent is present. Any other approach “violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.” Purkett, supra, — U.S. at-, 115 S.Ct. at 1770.
With a proper understanding of the respective burdens in this case, we turn now to the specific reasons the court of appeal found that juror Devezin had been improperly struck from the panel. The prosecutor gave two reasons for striking Devezin, that her husband’s uncle worked with juveniles and that she was “weak” on the death penalty. The court of appeal found these reasons insubstantial, noting that Devezin had denied her relative’s work with juveniles would affect her as a juror and that her responses to queries about the death penalty “do not indicate weakness.”
Although it is a close call, we agree with the court of appeal that the prosecutor’s death-penalty related reason for striking De-vezin, when viewed in the context of the record, was insubstantial. Devezin stated that she considered both the death penalty and life sentence to be “severe,” not “too severe” as the prosecutor recalled it. In addition, it is instructive that Devezin’s responses to this line of questioning followed verbatim that of several jurors prior to her who were asked the same question, some of whom were removed and some of whom ended up on the jury. It may be that the prosecutor simply forgot what Devezin had actually said; this is, however, immaterial, since a mere assertion of prosecutorial “good faith” is insufficient in the context of a Bat-son challenge.
We disagree with the court of appeal regarding the validity of the other reason the *291 prosecutor gave for striking Devezin. The hocourt of appeal relied upon Devezin’s assertion that she had not spoken with Dr. Devezin about his work and that it would not affect her deliberations as a juror. However, the prosecutor in this case obviously perceived that this connection could consciously or unconsciously affect the juror’s deliberations, a view perhaps supported in some part by Devezin’s view of penal rehabilitation, and he was entitled to strike the juror on that ground alone. The trial judge, who was able to see and hear Devezin during voir dire, obviously felt that the prosecutor had a reasonable basis for making this call, and we find that the record, although scant, supports that determination.
Juror Price was struck because of his employment with HANO, including his employment in the Magnolia Project over twenty (20) years before the time of trial, and a prior jury vote. The court of appeal found that the relationship of Price to the Magnolia Housing Project, and indeed the involvement of any Project residents with the case, was “tangential.” In addition, the court of appeal found that “the statement about prior jury service is contradicted by the record.” Green, supra, 634 So.2d at 511.
Regarding the statement of prior jury service, while we disagree with the court of appeal’s strong pronouncement that it “is contradicted by the record,” we do find that it is not supported by the record. There is nothing in the record demonstrating how the prosecutor became aware of Price’s prior jury vote; the question was never asked of Price during voir dire, and the prosecutor never articulated or presented documentary evidence showing the basis of his knowledge of Price’s vote. Although the State during oral argument was able to present a plausible, and possibly satisfactory, answer to our concerns, the statements of counsel during oral argument are not part of the official record which we review in this case. While we recognize that the defendant has the ultimate burden of persuasion in this case, we find that such an unsupported assertion, which has the appearance of being pulled out of “thin air,” is simply too insubstantial to resist the prima facie case offered by the defense.
hiThis leaves us with the second justification given by the prosecutor for striking Price, his employment with HANO and his relationship with the Magnolia Housing Project. The record refutes the court of appeal’s conclusion that the evidence dealing with the Magnolia Project was “tangential.” See Note 16, supra. The recanted confession of Joseph Davis, a Magnolia resident, and the circumstances surrounding this confession took up much of the testimony at the first day of Green’s trial. Davis’s arrest and initial statement all occurred within the Magnolia Project’s boundaries. Furthermore, Davis and several of his companions testified at trial and were identified in-court by other State witnesses. This testimony was presented by the State in an apparent attempt to defuse what the prosecutor anticipated would be the linchpin of the defense theory of the ease, i.e. that another group of men had murdered Pamela Block. We find that evidence related to the Magnolia Housing Project and its residents comprised the vehicle by which Melvin Green sought to exculpate himself, and therefore cannot be considered “tangential” to the issue of his guilt.
When the prosecutor’s work-related reasons for excluding Price are viewed in light of the evidence the prosecutor legitimately (and correctly) anticipated would be discussed at trial, we find that the defendant’s Batson challenge must fail. Melvin Green’s trial offered the prospect of a great deal of evidence involving police activity in a housing project of just the sort Price had worked in and around for over twenty (20) years. In addition, Price’s connections with the Magnolia Project, while dated, still offered the possibility that Price might be familiar with some of the personalities discussed in the case, and that this familiarity might in some way influence his deliberations in the jury room. Significant factors in our view are the long period of Price’s employment, the specific “on-site” nature of his work (facility maintenance manager), and his former connection with the particular project involved in this case. While any of these factors alone would probably be insufficient to warrant the exercise of a ^peremptory strike, even in the face of the relatively weak showing made by the defendant in this case, together they *292 support the trial court’s determination that the prosecutor was not acting out of discriminatory motive when he exercised a peremptory challenge against Alfred Price.
D. Summation on Batson Issue
For these reasons, we find that the court of appeal erred when it sustained the defendant’s Batson challenge to the striking of jurors Devezin and Price. The trial judge did not abuse his discretion when he found that the prosecutor did not strike these prospective jurors because of their race.
IV. Conclusion
The trial court did not err in ruling Melvin Green’s confession admissible at trial. In addition, the trial court correctly found that the prosecutor’s use of peremptory strikes against jurors Devezin and Price was not a Batson violation.
DECREE
For the reasons set forth in this opinion, we reverse the decision of the court of appeal and reinstate the conviction and sentence of Melvin Green.
JUDGMENT OF THE COURT OF APPEAL REVERSED; CONVICTION AND SENTENCE OF DEFENDANT REINSTATED.

 Judge Henry L. Yelverton, Court of Appeal, Third Circuit, who sat for the hearing cycle of April 10-13, 1995, by assignment as Justice Pro Tempore in place of Justice James L. Dennis, Associate Justice, was not on panel for this case. Supreme Court Rule IV, Part 2, § 3. See State v. Barms, 615 So.2d 285, 286 nl (1993).

. Testimony taken from homicide detectives at trial reveals that the informant, whose identity the trial court ruled was privileged information, knew Melvin Green personally.

. Claiborne and McClow were indicted along with Melvin Green for Block’s murder. Green moved pretrial to sever his trial from that of his two codefendants, and the trial court granted his motion. The State subsequently amended the bill of indictment to charge Claiborne and McClow with second degree murder in violation of LSA-R.S. 14:30.1. Claiborne was ultimately tried and convicted of manslaughter, see LSA-R.S. 14:31, and his conviction and sentence have been affirmed. State v. Claiborne, 624 So.2d 17 (La.App. 4 Cir.1993). The State entered a nolle prosequi as to McClow.

.The tape recorder and cassette tape utilized were the personal property of one of the homicide detectives, and not the property of the City *277 ot New Orleans. Detective Demma testified at trial that due to "financial straits,” the use of audio tape recordings, in the typical scenario, "wasn't a tool that we had to conduct investigations." He stated further that "[t]his is something, a new field that we are getting into." Detective McCord also testified that the tape recorder did not have batteries and was powered at the police station by being plugged into an electrical outlet. For this reason, Detective McCord stated, the tape recorder was not carried out of the police station and thus was not available to the detectives when Green’s gun was recovered and Green first confessed to murdering Mrs. Block.

. The defense also alleged inconsistencies in the transcripts of the two tape-recorded confessions. The trial court granted the defense motion in part for the sole purpose of comparing the audio recordings to their transcripts. The trial court subsequently approved several amendments to the transcripts, and the amended versions were the ones utilized at Green's trial.

. As will be discussed in greater detail herein, it is uncertain at what stage of the jury selection process the Batson challenge was lodged by the defense. In any case the prosecutor, while noting that "I was under the impression that the Batson challenge had to be offered at the time that we made our perempts,” did not specifically object to the defense's Batson challenge on timeliness grounds.

. Dr. Zimmerman also testified during the penalty phase of the trial, duplicating in large measure his pretrial testimony.

. There appears to be some confusion in the jurisprudence as to whether, as a matter of Louisiana constitutional law, police misconduct or overreaching is required before a criminal defendant's statement may be suppressed based upon involuntariness. State v. Glover, 343 So.2d 118 (La. 1976) (on rehearing), reflecting the view of the United States Supreme Court at the time, posited that the existence of police misconduct or overreaching was not determinative as to the evidentiary admissibility of an involuntary confession; rather, the Court adopted the view "that the probable testimonial trustworthiness of a confession still is and ought to be established as a necessary antecedent to its introduction in evidence.” Glover, supra, 343 So.2d at 131. However, subsequent to our decision in Glover the United States Supreme Court held that, contrary to the suggestion of its prior jurisprudence, "coercive police activity [is] a necessary predicate to the finding that a confession was not voluntary within the meaning of the due process clause of the fourteenth amendment.” State v. Comeaux, 514 So.2d 84, 92 n. 3 (La.1987), discussing Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). This Court has endorsed, without much discussion, the Supreme Court’s current approach. State v. Schrader, 518 So.2d 1024, 1027 (La.1988) ("an essential prerequisite for suppressing a statement on voluntariness grounds is misconduct or overreaching by the police”). Although the facts of this case do not require us to address this question, we do note that at least one court of appeal has recognized this dilemma and has seized upon LSA-R.S. 15:451 as an independent statutory ground, apart from the motion to suppress unconstitutionally obtained evidence provided for by LSA-C.Cr.P. Art. 703, to exclude involuntary confessions made in the absence of police misconduct. State v. Martin, 94-252 (La.App. 5 Cir. 10/12/94), 645 So.2d 752; writ denied, 94-2787 (La. 3/10/95), 650 So.2d 1174. See also State v. Coleman, 390 So.2d 865, 868 (La.1980) (LSA-R.S. 15:451 "safeguards a defendant's Fifth Amendment protection against self-incrimination”).

. The position of an arrestee who has expressly invoked his Miranda rights, either to remain silent or to the assistance of counsel, is distinguishable from one who has been informed of his rights but has chosen for whatever reason not to avail himself of them. See Davis v. United States, — U.S. -, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). When a person in police custody invokes his Miranda rights, the conditions under which the police may legitimately continue interrogating that person, as well as the circumstances under which a valid waiver may be obtained, are rigidly circumscribed. See McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); Minnickv. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). When Miranda protections are not specifically invoked, on the other hand, police may continue questioning the suspect in the hope of obtaining a statement since "[t]he fundamental purpose of the Court's decision in Miranda was 'to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.” Connecticut v. Barrett, 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987) (citations omitted) (emphasis in original). Nevertheless, in either case the admissibility of any statement obtained through custodial interrogation ultimately depends upon whether the defendant, either expressly or impliedly, waived his rights prior to speaking. State v. Abadie, 612 So.2d 1 (La. 1993), cert, denied, - U.S. -, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993).

. Detective McCord testified during the hearing on the motion to suppress that prior to signing the "rights of arrestee” form Green responded affirmatively when asked whether he was able to read and write. See State v. Neal, 321 So.2d497 (La. 1975).

. Dr. Zimmerman testified that he administered the following tests to Green:
Okay. I administered the Benton Visual Retention Test, this is a test of perceptual motor abilities.
I administered the Screening Test for the Luria Nebraska Neuropsychological Battery, which is a test to screen to see if the full battery might be necessary.
I administered the Luria Nebraska Neurop-sychological Battery, which is a test for brain dysfunction.
The Weschler Adult Intelligence Scale, which is an intelligence test.
The Wide Range Achievement Test Revised, which is a test of academic abilities.
The Personality Assessment Inventory, which is an objective personality test.
The Minnesota Multiphasic Personality Inventory, which is also an objective personality test, both of which were read to him because his reading abilities are too poor for him to do these.
I administered the Rorschach, which is a projective personality test, and the House-Tree-Person Technique, which is also a projective personality test.

.Zimmerman defined these terms in the following manner:
Okay. The difference between the two terms — mildly retarded is a psychiatric or psychological term; educable is a term used in schools and academic institutions. Educable means that with certain help, different from *282 what we give to normal students, the individual has the ability to learn some things; cannot learn as we expect the normal student to learn; but they do have some ability to learn.

. Dr. Zimmerman testified as follows concerning the factual basis for his diagnosis of "brain dysfunction:”
Melvin completed the ninth grade and was in the tenth grade when he dropped out of school.
However, when we look at his school records and we compare them with the Wide Range Achievement Test, his functioning in reading and spelling is below the third grade level and in arithmetic is at the fifth grade level.
When we do the test for brain dysfunction, part of the calculation we have to put in to find the critical level is education. Using the ninth grade level, he had nine of the 11 clinical scales in the critical range and seven of the eight localization scales in the critical range. That means we find brain dysfunction.

. In the course of making this second recorded statement the detectives had Green mark his position during the commission of the offense on a map of the immediate area of the crime scene. Detective Demma testified at trial that he utilized the map to clear up the single inconsistency between Green’s statement and the crime scene evidence, namely Green's contention that he had shot Mrs. Block through the driver’s side window:
He was pretty specific on everything except for which direction — which way the direction of the car was. It wasn’t until we came up to the decision to use a map we realized that he just had the car flip-flopped. He was right about everything else, about him being in the street, the other two being on the sidewalk, and that he fired — when he fired the gun, that it was fired through — it was fired out in the street at that side, and the passenger side of the car was actually facing the street.

. Such an approach is of course only permissible where a valid Miranda waiver has already been established, since the use of a defendant's prior experience with the criminal justice system alone to show a waiver of constitutional rights, express or implied, in any particular case would go far to indulge a presumption of the kind we found impermissible in McGinnis, supra.

. We reject the State’s contention that a suppression motion may never be re-opened for the taking of further evidence; such determinations rest within the sound discretion of the trial court. State v. Cummings, 493 So.2d 107 (La.1986); State v. Cole, 434 So.2d 1103 (La. 1983). However, the late hour of this motion and its filing after a final ruling had been entered on the original motion to suppress are facts which might well cause a trial judge to question the integrity of the evidence presented. Although all such submissions should be scrutinized with a serious eye by trial and appellate courts alike so that injustice through neglect is not perpetrated upon an innocent defendant, nonetheless the timing of the defense's proffer was a legitimate factor both for the trial court to consider in its initial ruling and for the appellate court to consider on review. We additionally observe, however, that when such a proffer finds its way into the official record it is prudent for the State to enter into that record rebuttal evidence, since reviewing courts are obligated, given our goal of adjudicating a just result, to consider the entire record in making these determinations.

. The Magnolia Housing Project was the home of Joseph Davis. Davis was a juvenile who was arrested shortly after the Block murder and initially confessed to being among the party which had accosted the Blocks outside of their home; in fact, Davis and his compatriots were the prime suspects in the Block murder until the "Crimes-toppers” informant directed police attention towards Green, Claiborne, and McCIow. Davis later recanted his confession, alleging that his confession had been elicited through police coercion. Davis testified for the State during the guilt phase of Green’s trial; it was this confession and related facts surrounding the initial stages of the police investigation into the Block murder that was the focus of defense cross-examination during the State’s case-in-chief.

.Devezin also testified during voir dire that she had previously been a juror in two cases, one ending in a mistrial and the other with a guilty plea, and that the prospect that the trial might overlap with vacation plans "would be a distraction to me somewhat.” While these statements arguably offered additional “race-neutral" grounds upon which the prosecutor could have rested his decision to peremptorily strike Devezin from the venire, these were not among the reasons articulated by the prosecutor. The prosecutor’s failure to include these statements to explain his actions leads us to believe that they were not reasons which he actually considered at the time, since when faced with a Batson challenge we can perceive of no reason a prosecutor would refrain from seizing upon any “race-neutral” justification of which he was aware to meet and resist that challenge. Since the focus of our inquiry is upon the intent of the prosecutor, we restrict our review in this case to the validity of the race-neutral reasons articulated, i.e. actually relied upon, by the prosecutor. - • '■! 7'-

. Although the constitutional basis of Batson was not immediately clear, the Supreme Court subsequently clarified the nature of a Batson challenge as an “equal protection” claim based upon an infringement of a prospective juror’s rights, which a party to the suit has third-party standing to raise, and not some aspect of a criminal defendant's Sixth Amendment right to a fair and impartial jury. See Georgia v. McCol-lum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). "All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination.” J.E.B. v. Alabama, - U.S. -, •-, 114 S.Ct. 1419, 1428, 128 L.Ed.2d 89 (1994).

. The Supreme Court has recently expanded this view, holding that the scope of the Batson challenge extends to other "suspect classifications,” such as gender. See J.E.B., supra.

. Disparate impact on a suspect class, while deserving of some weight in the determination of whether purposeful discrimination exists, is not a dispositive factor, since "[a]n argument relating to the impact of a classification does not alone show its purpose.” Hernandez, supra, 500 U.S. at 362, 111 S.Ct. at 1867 (citation omitted).

. However, the fact that the prosecutor's avowed reason for exercising a peremptory strike "corresponds to a valid for-cause challenge will demonstrate its race-neutral character.” Hernandez, supra, 500 U.S. at 363, 111 S.Ct. at 1868.

. In Purkett, supra,-U.S. at-, 115 S.Ct. at 1770 (citations omitted), the United States Supreme Court clarified the scope of the second stage of the Batson analysis:
The Court of Appeals appears to have seized on our admonition in Batson that to rebut a prima facie case, the proponent of a strike 'must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges,' and that the reason must be 'related to the particular case to be tried.' This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a legitimate reason’ is not a reason that makes sense, but a reason that does not deny equal protection.

. Melvin Green's evidence of purposeful discrimination, while sufficient to make his prima facie case, is a relatively weak one. The entirety of the defendant’s case rests upon the following facts: that the State exercised eleven (11) out of twelve (12) peremptory strikes on black jurors, that the final jury composition was eight (8) whites and four (4) blacks, and that the defendant himself was black. The defendant has failed to describe the racial composition of the entire venire, information which might have allowed us to draw conclusions based upon a wider appreciation of the “disparate impact” upon prospective black jurors caused by the prosecutor's actions. See Note 20, supra. In addition, the defendant has failed to direct our attention to any particular statements, or any specific pattern of strikes or pattern of questioning within a specific jury panel, which might support an inference of discriminatory purpose. Nor does the late hour of the defendant’s Batson objection, after the jury had been selected and sequestered, help to cast the defendant’s challenge in a favorable light. While ultimately the question we are concerned with is the veracity of the prosecutor, circumstances such as these help paint the context in which the prosecutor’s statements are evaluated, and we are not unmindful that the ultimate burden of proof in this case rests not upon the prosecutor to disprove his *290 discriminatoiy intent, but rather upon the defendant to prove it.

. The inference is "necessary” because if such an inference cannot be drawn from the evidence presented by the defendant, he is unable to make a prima facie case of purposeful discrimination and his Batson challenge expires at the threshold.