JOHNSON, J.
I, Defendant/Appellant, Robert . C. Williams, appeals his convictions and sentences from the 24th Judicial District *375 Court, Division “M”. For the following reasons, we affirm,
FACTS AND PROCEDURAL HISTORY
On February 26, 2015, Defendant and 20 other co-defendants were charged in a 36-count indictment for various acts of racketeering committed in furtherance of a narcotics distribution network on the West Bank of Jefferson Parish operated by a street gang known by its members as the “Harvey Hustlers.”[1] Specifically, Defendant was charged with racketeering, in violation of La. R.S. 15:1352 (count one), attempt or conspiracy to distribute, cocaine, in violation, of La. R.S. 40:979 and La. R.S. 40:967(A) (count two), conspiracy to distribute heroin and marijuana, in violation of La. R.S, 40:979 and La. R.S. 40:966(A) (count three), two counts of possession of a.firearm by a convicted felon, in violation of La. R.S. 14:95.1 (counts fifteen and eighteen),[2] illegal possession of a stolen firearm, in violation of La. R.S. 14:69.1 (count sixteen), and possession with intent to distribute cocaine, in violation of La. R.S. 40:967(A) (count nineteen),[3] Defendant pleaded not guilty to the charged offenses at his arraignment on March 26, 2015.
On October 8, 2015, the trial court, heard and denied Defendant’s motion to suppress wiretaps. The trial court also denied two of Defendant’s oral motions to sever co-defendant Smith during trial on October 27 and 30,2015.
Trial before a 12-person jury commenced against Defendant and codefen-dant' Smith on October 27, 2015. At trial, evidence was presented that this j2case arises from a federal investigation ■ conducted by a task force identified as the Federal Bureau of Investigation (FBI) New Orleans Gang Task Force, comprised of federal and state officers, into drug trafficking in Jefferson Parish. Through the investigation, law enforcement learned that a narcotics distribution network was being operated on the West Bank of Jefferson Parish by a violent street gang known as the “Harvey Hustlers.” It was discovered that members of this narcotics organization would obtain controlled dangerous substances transported into the New Orleans area from known source locations, including the State of Texas, from fellow gang members and other associates. The acquired narcotics were then converted into saleable form and provided to street level dealers working for the Harvey Hustlers, who in turn would’ sell the product for the profit of the gang’s members.
According to the testimony established at trial, while operating their narcotics network, the members of the Harvey Hustlers and their known associates committed various drug offenses and, other criminal acts including, but not limited to, murder, solicitation to commit murder, obstruction of justice, and illegal possession of firearms. Witness testimony confirmed that Defendant, Robert Williams aka “Lil Rob,” held a leadership role in the Harvey Hustlers and as such, directed the illegal activities of other gang members, while co-defendant, Alcus Smith aka “Bug,” participated in the transportation and distribution of *376 wholesale amounts of powder cocaine to Harvey Hustler members. Information regarding the inner workings of this criminal enterprise were further obtained from numerous wiretaps secured on cellular telephones belonging to Defendant, co-defendant Smith, and other members and/or associates of the Harvey Hustlers.
As a result of the multi-agency investigation, which spanned several years, 21 defendants were indicted in both federal and state courts and charged with over 50 acts of racketeering and 30 additional criminal offenses. The specific facts | ^adduced at trial surrounding the offenses for which Defendant was charged are as follows.

The drug trafficking investigation

FBI Special Agent Todd Schliem testified regarding the multi-agency investigation spanning the course of years of the Harvey Hustlers, recognized for extreme acts of violence associated with drug distribution in Jefferson Parish. According to Special Agent Schliem, the members of the Harvey Hustlers and their known associates totaled over 100 and their purpose was to make money through the sale of narcotics. He explained that in 2005—in the time period following Hurricane Katrina—there was a limited supply of narcotics available in Jefferson Parish, with one exception. In the Scottsdale neighborhood on the West Bank of Jefferson Parish, the Harvey Hustlers were able to establish and/or maintain a significant drug supply, thereby creating high demand for them product. Special Agent Schliem noted that from that time forward, the Harvey Hustlers exerted influence in Scottsdale and other neighborhoods in Jefferson Parish, establishing a hierarchy inside their gang.
Defendant’s brother, David Williams aka “Mr. Harvey,” was identified as the leader of the Harvey Hustlers until his murder in 2010. It was discovered that during the time period when the Harvey Hustlers were experiencing very profitable drug sales, there was an internal strain amongst the gang members vying for leadership positions. A “civil war” broke out, dividing the group into those who supported David Williams and those who supported brothers Melvin and Jermaine Hudson. Special Agent Schliem described the events leading up to David Williams’ murder as a “domino effect” beginning with the murder of Chad Jones, a close associate of David Williams. He explained that when David Williams discovered that a fellow gang member by the name of Laval London had participated in Jones’ murder, David Williams had London killed in retaliation. | Consequently, in retaliation for the murder of London—who was a close associate of the Hudson brothers—David Williams was killed.[4] During this turmoil, the Harvey Hustlers separated into subgroups based on their identified loyalties. Those loyal to the Hudson brothers grouped into subsets of the gang identified as the “Murder Squad” and the “Young, Black and Successful” (YBS), while those loyal to David Williams and his brother, Defendant, identified as “HH.”
Based on the investigation into the members of the Harvey Hustlers, approximately ten federal and state court indictments were obtained resulting in over 20 convictions. At the time the state and federal indictments were returned, Defendant was recognized as one of the leaders of the Harvey Hustlers.
Several investigative techniques were employed while conducting the investigation into the Harvey Hustlers, including *377 basic surveillance, analysis of phone records, witness interviews, use of confidential informants, controlled narcotics purchases, and wiretaps. Among the relevant wiretaps were those placed on the cellular telephones of Defendant, Defendant’s brother, Clifford Sonnier, and Nathan Carter beginning in October of 2013. Special Agent Schliem identified for the jury numerous intercepted phone calls purported to capture the voices of Defendant and/or Sonnier and their alleged associates. Specifically, testimony was elicited regarding a November 6, 2013 intercept wherein Defendant received a phone call from an unidentified female who alerted him that the police had been by his residence at 1104 Clydesbank and reminded him that he “put his mojo [synthetic marijuana] in there.” Defendant then replied, “[y]ep and my hammer,” which Special Agent Schliem explained is street vernacular for a firearm. Special Agent Schliem noted that the referenced firearm was stolen and had been seized from the residence by Detective John Wiebelt.
| ¿Detective Wiebelt of the Jefferson Parish Sheriffs Office (JPSO) confirmed that on November 6, 2013, he assisted in an eviction at 1104 Clydesbank. The home was unoccupied, and inside, officers seized a firearm and a black bag containing synthetic marijuana (also known as “mojo” or “gas”) and a digital scale. It was discovered that the firearm seized had been stolen.[5]
Special Agent Schliem also identified various phone calls and text messages exchanged between members of the gang and their known associates including code-fendant Smith and Sonnier, leading up to a meeting to conduct a drug transaction at a daiquiri shop in Harvey, Louisiana, on November 18, 2013.
The relevant intercepted communications began with a text message sent by Sonnier to Carter at 2:55 p.m., in which Sonnier texted Carter: “Sup Big Homie.” At 3:10 p.m., Carter responded, “I’m ’bout to call him.” Carter then sent another text message to Sonnier that said: “he ’bout to call you from a 758 num.” Special Agent Schliem noted that “758” is the first three digits of the phone number used by co-defendant Smith. A phone call was then made at 3:17 p.m., by co-defendant Smith wherein co-defendant Smith told Sonnier, “Nathan gave me your number” and Son-nier told co-defendant Smith, “give me three of them,” prompting codefendant Smith to respond, “like last time.”[6] Two subsequent conversations between Sonnier and an unidentified female reflect Sonnier’s effort to obtain “about $1500.” Then, at 5:29 p.m. co-defendant Smith texted Sonnier, “I’m ready when you ready.” Son-nier then texted co-defendant Smith at 5:55 p.m. inquiring as to his whereabouts, to which co-defendant responded, “I’m on Ames.” Sonnier informed co-defendant Smith that he was at the daiquiri shop, and co-defendant Smith replied, “K. On my way.” Meanwhile, a phone call was also 1 ^intercepted between Sonnier and Willie Thornton during which Sonnier told Thornton that he wants him to “work his *378 magic for me”[7] and that he will pick him up. At 6:17 p.m., Sonnier asked co-defendant Smith where he was and advised him that he was turning on Manhattan Boulevard at Lapalco, to which co-defendant Smith informed Sonnier that he was “about to pull up there.”
FBI Agent Lon Boudreaux testified that he participated in' the'wiretap surveillancé of the phones belonging to Defendant arid Sonnier on November 18, 2013. Based on the content of the phone calls, officers monitored the movements of Sonnier’s Mazda. During the course of the surveillance, Agent Boudreaux testified that he observed activity consistent with narcotics trafficking. Agent Boudreaux testified that at one point, he. followed the Mazda to a. daiquiri shop at Lapalco and Ames Boulevard where a meeting took place. At the daiquiri shop, Agent Boudreaux .observed a red Malibu pull-up alongside the Mazda and throw an object into the Mazda. Finding this activity suspicious, officers followed the red Malibu before receiving a phone call from Special Agent Schliem regarding a second meeting and delivery of narcotics that was scheduled to occur at another daiquiri shop on Manhattan Boulevard.
Upon arrival, Agent Boudreaux observed the Mazda pull into the parking lot and noticed Sonnier standing outside talking to Thornton.[8] A few minutes later, Defendant walked out of the daiquiri shop, and a Nissan sports car pulled in and parked across from Sonnier’s vehicle. Co-defendant Smith exited from the driver’s side of the Nissan.[9] According to Agent Boudreaux, co-defendant Smith approached Sonnier and spoke to him.[10]. Co-defendant Smith then escorted |7Thornton back to his vehicle where two other unidentified individuals exited the Nissan and served as “lookouts,” while Thornton and Smith got into the car. Approximately one minute later, Thornton exited the Nissan and went back to where Defendant and Sonnier were standing. After a time, Defendant, Thornton, Sonnier, and an unidentified female entered the Mazda with Brandon ,Motion behind the wheel. The vehicle then departed followed by intercepting undercover police units. A high-speed chase ensued during which a text message was intercepted between Sonnier and. co-defendant Smith that read, “you serious fool?” After the chase, Agent Bou-dreaux indicated that Thornton and Mot-ton were apprehended, but the remainder of the occupants in the vehicle evaded officers on foot.
On cross-examination, Agent Boudreaux testified that on a couple of previous occasions, he had seen Defendant and Sonnier “drive around all night stopping at one location and the next,” and that based on the wiretaps, it was concluded that they were participating in drug transactions.
The high-speed chase was explained in greater detail by Detective Anthony But-tone of the JPSO, who testified that on November 18, 2013, at approximately 6:30 *379 p.ra.,. he participated in a joint investigation with the FBI in which a mobile surveillance of a daiquiri shop, on Manhattan Boulevard and the West Bank Expressway, was conducted. Pursuant to the surveillance, Detective Buttone, along with Agent Mike Tucker and Lieutenant Kevin Decker—each in separate unmarked police units—followed a silver Mazda as it exited the parking lot of the daiquiri shop. After having observed several traffic infractions, Detective Buttone elected to conduct a traffic stop. Detective Buttone testified that the Mazda stopped briefly before it sped off. A high-speed chase ensued, and sight of the vehicle was lost for a brief period of time. The Mazda was ultimately discovered in a driveway at 917 Drake Avenue, where it had been abandoned. Inside the |Rvehiclé, the officers seized two plastic bags containing what appeared to be marijuana,[11] sandwich bags containing a razor blade, a digital scale, and crack cocaine.[12] The driver, Brandon Motton, and a passenger, Willie Thornton, were found hiding nearby and were taken into custody.
Detective William Roniger of the JPSO also participated in the high speed chase and arrests of Motton[13] and Thornton. On the evening of their apprehension, Detective Roniger testified that his role was to monitor the telephone wiretap surveillance of cellular phones registered to Defendant and Sonnier, and to- participate in the -mobile surveillance of the Mazda. Detective Roniger testified that during the chase, information was gleaned from- communications on the wiretap that provided some indication of the actions of the individuals inside the Mazda. This information included the whereabouts of Defendant and Son-nier in the immediate aftermath of the chase, as well as information regarding objects that may have been thrown from the Mazda during the chase,-
Accordingly, a search of the route taken by the Mazda during the chase was conducted resulting in the recovery of various photographs, 128 grams of cocaine, four grams of crack cocaine, and a Glock firearm—later learned to have been reported stolen. Detective Roniger further testified on cross-examination that based on Defendant’s own admission heard on the wire intercepts, he believed Defendant was the only person inside the Mazda to have possessed the firearm that was recovered.[14] Detective Roniger also testified regarding several “controlled buys” he oversaw between his confidential informant and members of the Harvey I ^Hustlers including Thornton, Keitrel Gumms, Richard Chess, Carlnell Pierce, and Corey Trent.[15]
*380 Special Agent Schliem was recalled and testified that prior to the meeting at the daiquiri shop in November of 2013, communications were intercepted demonstrating Sonnier’s intent to acquire narcotics. He further indicated that after the meeting at the daiquiri shop and during the high-speed chase between the officers and the Mazda, a text message was sent between Sonnier and co-defendant Smith. The text message read, “U serious fool?” Later that evening, Sonnier then sent a text message to an unknown person writing, “[m]an, dis sum crazy s**t. I think n***er jus try to set me up. I jus went spent 5,000 wit him. We met on Manhattan. By time I made it to Ames I was getting pull o.” Agent Schliem noted that $5,000 would be enough money to purchase the 4.5 ounces of cocaine discarded from the Mazda and seized from the side of the road following the chase. Another text message, also sent by Sonnier that same evening, to another unidentified individual stated, “[m]an, my f**king lil world so crazy, bruh. I jus got n a high-speed chase bout a hour ago. Took a lost for 5 racks.[16] Well, I hope its not a lost. I gotta go find it. I think n***er tried 2 set me up. I knew I shouldve brought u dat money. My nerves so bad. Got the ear towed & all.”
The day. after the chase, November 19, 2013, a text message from Sonnier to Nathan Carter—an associate/business partner of co-defendant Smith—was intercepted. In the text message, Sonnier wrote to Carter, “[c]an you meet me sumwea big son i need to holla at u str8up,” to which Carter replied, “[b]e down there this weekend.” Approximately four minutes later, Sonnier responded to [ mCarter, “Son, bull[17] told u wat happen?” to which Carter replied “Yea.” Next, Sonnier then texts, “Big son, that was all I had son, nolie && dey towed my gurí s. I’m n dis lil rat motel wit nutlO. Feel me. Cnt go hme. Scared dey gon cum dea. I need u tho so,” to which Carter responded, “Ima hit u when I come down,” prompting Sonnier to reply, “Imma just lay low till u cum thru son dis s mad crazy.”
In addition to these text message communications, Special Agent Schliem testified that telephone calls were also intercepted following the chase. In these communications, Defendant was heard admitting to his participation in the event, as well as to his possession of a firearm, aka a “hammer,” and to having pointed the firearm at Motion in order to compel him to evade the police. Specifically, Defendant was heard talking about Sonnier’s vehicle, the Mazda, that was searched by the police, “[t]hey ain’t nothing in there, though. They ain’t got nothing in it, but we got beaucoup pictures and s**t int here.” In the pictures referenced by Defendant, various members of the Harvey Hustlers, including Defendant, Sonnier, Motton, Tavaris Ar-buthnot aka “T-row,” Ray Woodruff, Isaac Smith, Frankie Hoofkin, Walter Wright, Kerry Reynard, Richard Chess, Keitrel Gumms, Cornell Harris, and Kevin Simmons, are depicted. Some of the gang members are seen wearing chains with the letters “HH”[18] for Harvey Hustlers or “SD” for Scottsdale. In another phone call, Sonnier was heard explaining to Defendant that when he went back to search for the gun and/or *381 drugs that were thrown from the Mazda during the chase, the ■ Westwego Police Department pulled him over and issued him a traffic citation and then let him go.
Willie ' Thornton testified under legal compulsion, pursuant to Louisiana Code of Criminal Procedure Article 439.1. Thornton testified regarding his' three Inprior felony convictions and his pending criminal offenses charged in the same indictment as Defendant and co-defendant Smith. Thornton told the jury that he had been incarcerated since November 18,2013, following a high-speed chase with the police. At the time of his arrest, Thornton was with Mot-ton aka “Pudgy,” Sonnier aka “Dut or Dirty,” and Defendant, whom he referred to as “Rob.” Thornton explained that Defendant and Sonnier are brothers, and he knew them fi’om growing up together, in the same neighborhood.
Thornton explained that in November of 2013, he was a passenger in the Mazda driven by Motton when they attempted to evade the police. He denied seeing Defendant point a gun at Motton during the pursuit or order him to drive off from the police but admitted to there being a quantity of “mojo” in the car. Thornton further denied any acquaintance with co-defendant Smith and, thus, denied taking possession of cocaine from Smith at the daiquiri shop prior to entering Motton’s ear and engaging in the high-speed chase. Thornton told the jury that he knew of the Harvey Hustlers, but in his opinion, he did not believe they were an organized group with an identifiable leader. Thornton named Melvin Hudson, Germain Hudson, Tedrick Bernard, Paul Smith aka “Buck,” Ellis Landix, Jr., and Corey Trent, as members or associates of the Harvey Hustlers.
Brandon Motton also testified under legal compulsion, pursuant to Louisiana Code of Criminal Procedure article 439.1. Motton admitted to having prior felony drug convictions and to being charged in the same indictment as Defendant and co-defendant Smith. He too testified that he was arrested following a police chase in November 2013 but denied being in the Mazda during the chase. Motton explained that at the time of his arrest, he was in the Day Development Subdivision in Westwe-go and was hiding from the police because he was on parole, further maintaining that he was not with Defendant, Sonnier, or Thornton prior to his arrest. He did however admit to knowing Defendant and Son-nier.
112Paul Smith testified that he was indicted along with Defendant and pleaded guilty to charges of racketeering, conspiracy to distribute cocaine, conspiracy to distribute heroin and marijuana, possession with intent to distribute oxycodone, and possession with intent to distribute cocaine. He further admitted ■ to being an active participant in the Harvey Hustlers through which he engaged in various criminal acts which included obtaining and selling narcotics. He testified that he did not “recall” Defendant being a member of the group. When the State confronted Smith with the factual basis made as part of his guilty plea, he testified that he did not “recall” accepting as true the statehient that “Members of the Enterprise who engaged in this activity on a daily basis ... included ... Robert ‘Lil Rob’ Williams.” It was further established that, at the time of his guilty plea, he swore as true that “Enterprise members and their associates engaged in acts of violence to protect the perceived interests of the Enterprise members, exact revenge upon enemies of the Enterprise members, punish Enterprise members whose conduct displeased Enterprise leaders and to develop the reputation of the Harvey Hustlers as a group to be feared by members of the community.”
*382 Harry Smoot testified that he pleaded guilty in federal court to several charges related to drug-trafficking conspiracy that took . place between January ■ 1, 2010 through November 20, 2013, wherein he conspired with Defendant, Sonnier, Frankie Hoofkin, Ray Woodruff, Terrence Kelley, and others to sell drugs. He admitted that, during the course of the conspiracy, he. provided drugs, including heroin, cocaine, and marijuana, to other individuals who participated in the conspiracy with the objective towards monetary, gains. He testified that he distributed large quantities of drugs to other “small time drug dealers” associated with the Harvey Hustlers, including Keitrel Gumms, Kerry Reynard, Richard Chess, and Bryant Gumms at Defendant’s behest. Smoot testified that at times he saw Defendant with large sums of money but could not state whether the money 11swas related to .any drug transactions. He further testified' that Defendant provided him with some “support and protection” as he transacted his drug business.
Torey Richardson testified that he was incarcerated on federal convictions for “conspiracy to possess firearms, RICO conspiracy and conspiracy to possess 280 grams or more of crack cocaine.”[19] Richardson told the jury that he sold drugs obtained from various members of the Harvey Hustlers-, including Melvin Hudson, Germain Hudson,. Paul Smith, and David Williams. During that time, he also observed Defendant sell cocaine “a few times” and claimed to know that Defendant supplied “slabs of cocaine”[20] to other members of the Harvey Hustlers.
Tedrick Reynard was also incarcerated at the time of trial for various federal drug related convictions.[21] Reynard testified that he was a drug dealer in the Scottsdale/Harvey area for eight to nine years. During that time, he was provided, with drugs supplied by members and associates of the Harvey Hustlers. Among his. suppliers were Defendant, .David Williams, and Melvin Hudson. He acknowledged that at some point a dispute amongst members of the gang broke out and, as a result, David Williams was killed. He testified that after David Williams was killed, Defendant stepped forward to “run things.” He stated that Defendant was “feared,” and, thus, people listened to him.

The transportation of narcotics from Texas to Louisiana

Donald Nance, former State Trooper with the Jefferson County Sherriff s Office in Texas, testified that on April 6, 2014, he received a call from Drug Enforcement Agency (DEA) Agent Mike Lumpkin regarding two vehicles; traveling from Houston on Interstate-10 in the direction of New Orleans, suspected to be carrying contraband. Sergeant Nance was able to locate the caravanning [ ^vehicles and effect a stop based on the information he received. Sergeant Nance testified that one of the vehicles—an Acura MDX—was driven by co-defendant Smith and inside a “hidden compartment” within the vehicle was $13,000.[22] Détective Eric Bowman, also of the Jefferson County Sheriffs Office, assisted Sergeant Nance in the stop of the vehicles and testified that the second vehicle was driven by Joseph Holmes and *383 was found to contain eight “bundles” of “drugs,” later confirmed to be cocaine, hidden underneath the front bumper.[23] Detective Bowman, testified that Holmes indicated he was traveling from Texas to Harvey, Louisiana.
Pursuant to the stop by Sergeant Nance and Detective Bowman, Holmes was arrested and pleaded guilty to possession with intent to distribute narcotics. Holmes testified that he and co-defendant Smith were traveling together in separate vehicles from Houston, Texas, to Harvey, Louisiana. He stated that he was transporting the cocaine in his vehicle, as he had done on prior occasions, pursuant to his business agreement with co-defendant Smith and Nathan Carter. Holmes explained that he would drive from Harvey to Houston and back after retrieving at least 20 kilograms of cocaine per month,[24] paid for by co-defendant Smith[25] and on occasion, Carter. He further testified that on his return trip he would always travel with a second vehicle whose purpose was to serve as a “look-out.”
Marlon Mercy also testified that he pleaded guilty to charges of racketeering and conspiracy to distribute cocaine in connection with his involvement in the procurement of cocaine to be transported between Texas and Jefferson Parish, Louisiana. He testified that while living in Texas, he worked with co-defendant | 1sSmith and Carter to obtain multiple kilograms of cocaine ranging in price from $27,500 and $28,000 per kilogram. Mercy testified that on the day of Smith’s and Holmes’ arrests, they had obtained cocaine from him in Houston at a man.known as “Payday’s” apartment. He explained that co-defendant Smith tested the product to ensure -its quality and then gave him money for the cocaine.
Nathan Carter testified that he too was incarcerated for having pleaded guilty to racketeering and conspiracy to distribute cocaine. Carter confirmed that he was involved with co-defendant Smith, Mercy, and Holmes in the distribution of cocaine from Texas to Jefferson Parish, Louisiana. He stated that, between November of 2013 and April of 2014, the group transported more than 20 kilograms of cocaine per month to Jefferson Parish. Once the cocaine was transported to Jefferson Parish, Carter testified that it was then sold at $31,000 per kilogram. He testified that once in . Jefferson Parish, co-defendant Smith distributed the cocaine to Sonnier. Carter told the jury that one time Sonnier complained to him that he had been involved in a police chase in November of 2013, which resulted in the loss of the cocaine he had obtained from co-defendant Smith.

Wiretap intercepts

FBI Special Agent Keith Hurriss testified as an expert in the field of- drugs, weights, prices, distribution of drugs, drug-trafficking, and drug-trafficking organizations. He explained to the jury that he monitored the wiretaps on Defendant *384 and Sonnier’s cellular phones in 2013. While monitoring Defendant’s phone conversations in November of 2013, Agent Burriss identified a conversation in which Defendant and a male named “Minny” discussed the need to “smoke somebody” named “Tosh.” Agent Burriss relayed this information to Detective Roniger, who then took the referenced individual into custody. In another call, Agent Burriss testified that he heard Defendant advise a caller that he would be liable to supply him with a “hundred dollars’ worth” of cocaine since the caller had run out of his supply. Agent Burriss further testified regarding a phone call to Defendant in which the caller asked about purchasing an ounce of cocaine, to which Defendant replied, “[o]n Dirty level, not my level.” Agent Burriss believed that to mean that such quantity is not what Defendant “typically does, it’s going to be whatever Dirty typically does.” In the same call, Defendant also noted that an ounce of cocaine would cost $1,100. Agent Burriss explained to the jury that with respect to narcotics trafficking in general, 20 kilograms of cocaine could net a profit of $450,000 per month.
Detective Roniger confirmed that he was the affiant on the wiretaps obtained on the phones belonging to Defendant and Sonnier. He testified that while monitoring Defendant’s phone, information was received regarding a potential threat to Tosh Toussaint’s life at the direction of Defendant. Toussaint was ultimately taken into custody on unrelated criminal charges and afforded protection based on the content of the intercepted phone call.
FBI Special Agent Schliem was recalled and testified regarding multiple wiretapped conversations amongst the members of the conspiracy.[26] Special Agent Schliem testified that among the wiretapped conversations were those between codefendant Smith, Carter, Marlon Mercy, and Holmes regarding the exchange of money to pay for approximately 20 kilograms of cocaine each month from a supplier in Houston to be transported back to Jefferson Parish. He also testified regarding multiple phone communications involving Defendant, Keitrel Gumms, Sonnier, and Ray Woodruff relating to drug trafficking and a shooting that occurred at the Lapalco Apartments on April 22, 2013.

The Murder of Donte Hall

| ^Detective Travis Eserman of the JPSO testified that he was the lead investigator assigned to the November 16, 2013 shooting death of Donte Hall, whose body was found outside of 2629 Pelican Bay Boulevard, Marrero, Louisiana. Detective Eserman testified that Hall was shot at approximately 7:00 p.m. in the middle of the street in a residential neighborhood and that co-defendant Smith was developed as a suspect. At the scene of the homicide, firearm casings were recovered and preserved for analysis. Additionally, three residences with security camera views of the homicide scene were retrieved and analyzed. Hall’s cell phone records were also obtained,[27] and it was noted that there were over 50 phone calls between phones registered to Hall and Smith on the day before his murder and on the day of his murder. There were also numerous phone calls between Hall and Leroy Bird, a close friend of Hall, who advised Detective Eserman of Hall’s activities leading up *385 to his murder. Information provided by Bird led Detective Eserman to an apartment in the St. Germaine Apartment Complex, Apt. F-301, used by Smith. After speaking with the leasee of the apartment—Robin Toussaint—Detective Eser-man obtained Smith’s phone number and then his cell phone records. From the phone records it was determined that the last phone call between Smith and Hall was at 6:41 p.m., approximately 19 minutes before Hall was murdered.
Robin Toussaint testified that she rented an apartment at the direction of code-fendant Smith[28] at the St. Germaine Apartment Complex located at 2101 Manhattan Boulevard, apartment F-301.[29] Ms. Toussaint never lived at the apartment but was asked by the apartment manager to come to the apartment to | 1Hspeak with the police about a murder investigation, at which time she provided the police with co-defendant Smith’s phone number and identified Smith from a photograph.
Leroy Bird, a friend of Hall’s and an incarcerated felon serving 16 years in prison, testified that Hall introduced him to co-defendant Smith, who would supply him with cocaine which he would then sell. He testified that he spoke to Hall less than an hour before Hall’s murder and that during their conversation, Hall told him he was “going to go ride with Bug [Smith].” He explained that the day before Hall’s murder, Hall had set up a drug deal between Smith and another individual, but instead of conducting the drug transaction, Smith had been robbed and thus believed Hall “had something to do with it.” He further testified that on the day Hall was murdered, he warned Hall not to go with Smith, to which Hall replied, “I’m not going to let that p***y a** kill me ... if he come by hisself [sic], I’m going to go with him. If he come with people in the car, I ain’t going with him.” Bird attempted to call Hall approximately 30 minutes after their conversation but received no answer. Thus, when Bird learned of Hall’s murder, he informed the police where Smith lived, admitting that he wanted to kill Smith himself for what he had done.
Maya Jackson testified that she was acquainted with co-defendant Smith and Hall. She testified that she was with Hall on the evening of his murder and saw Smith pick up Hall in a black Infiniti.[30] She also noticed a white vehicle speed off behind Smith’s vehicle after picking up Hall.[31]
Nathan Carter also told the jury that four hours prior to Hall’s murder, he |19spoke to co-defendant Smith who informed him that Hall had “set him (Smith) up to be ripped off in a drug transaction,” and that he intended on “getting him back.” Carter took this to mean that Smith was going to “rob, harm, or kill” Hall, so he advised him “not to do it.” The next *386 time Carter spoke with Smith he indicated to him that “it was done,” and “no one knew he had done it and that he didn’t have anything to worryabout.”[32]
Jene Rauch of the JPSO Crime Laboratory testified as an expert in firearm and toolmark identification and shooting incident reconstruction. Based upon' her analysis of the ballistics material in the Hall shooting, she concluded that “at least three guns” were discharged at the scene. The casings were consistent with having been fired from at least one 9 mm weapon and two .40 caliber weapons.
The jury was unable to reach a verdict on this second degree murder charge, resulting in a hung jury.[33]

The Murder of Albert Bullock

Raheem Robinson pleaded guilty - to manslaughter, having shot and killed A1-. bert Bullock for a paid fee of $10,000 given to him by Defendant.[34] Robinson testified that Defendant and his late brother, David Williams, are his cousins. He further testified that David Williams was the leader of the “gang” and that the “gang” sold drugs. He explained that, after David Williams’ death, he continued to associate with members of the gang, including Defendant and Harry Smoot— the man from whom he obtained the drugs that he would then sell. He further testified that Smoot was the primary supplier of drugs for the gang and that' Defendant was the “muscle” behind the whole operation. He advised that one of his responsibilities, on order of Defendant, was to protect Smoot. If someone | ^threatened Smoot, he understood that he was to kill the aggressor. He testified that the other members' of the gang also took orders from Defendant. Robinson noted that Smoot was present on the night he shot Bullock.[35] -
Dr. Dana. Troxclair, expert in forensic pathology, testified that she performed the autopsies on Bullock and Hall. Both deaths were classified as homicides. Specifically, with regard to Bullock, Dr. Troxclair indicated that he died as a result of a gunshot wound to the head. Dr. Troxclair testified that the presence of soot' around the wound as well as a.partial muzzle imprint indicated that Bullock suffered from a contact, or near contact, gunshot. The cause of death a,s to Hall was multiple gunshot wounds. Dr. Troxclair explained that Hall sustained a total of nine distant gunshot wounds, * with two of the wounds being fatal. Projectiles and projectile fragments were removed from the body of Hall and preserved for analysis.

The April 22, 2013 attempted murders

Colonel Timothy Scanlan testified as an expert in firearm and tool mark examination, crime scene reconstruction, crime scene processing, and blood stain pattern analysis. He testified that on April 22, 2013, he supervised the processing of the scene of a shooting at the *387 apartments located at 2300 Lapalco Boulevard. He described the crime scene for the jury, noting that upon his arrival there were approximately 20 casings in front of the door to one of the apartments, as well as multiple bullet holes through the entranceway door. He further stated that the living room and kitchen were covered in blood and numerous projectile trajectories were observed throughout the living room area of the apartment. Two firearms were eventually recovered and compared to the ballistics material recovered at the scene of the shooting. After analysis, it was discovered that one of the firearms, a imQtoek 9 mm pistol, was not discharged at the scene, but that the second firearm, an assault rifle, was. .An additional .40 caliber firearm was used during the shooting yet was never recovered. .
Rosetta Roussell testified that in the early morning hours of April 22, 2Q13, she was asleep in her cousin’s ■ apartment at 2300 Lapalco Boulevard, when she was awakened by the sound of someone knocking on her door claiming to be the police. When she opened the door shots were fired. Ms. Roussell sustained a gunshot wound to her leg and other occupants inside the apartment were injured.[36]
Sergeant Charles Lee of the JPSO testified that on April 22, 2013, he met with several officers at a school located near the Lapalco apartment complex for the purpose of attempting to effect an arrest related to a felony warrant. While there, multiple gunshots were heard coming from the apartment complex next door. Sergeant Lee and the other officers relocated to the scene of the shooting, at which time, Sergeant Lee observed a dark-colored.vehicle speed out of the apartment complex. The officers gave chase as the vehicle fled. The vehicle eventually crashed, and the suspects—the driver, and three passengers—fled on foot. Ultimately four suspects—Frankie Hoofkin, Charlie Gumms, Lashawn Davis, and Davante Robertsom— were arrested.
At the conclusion, of the trial, the jury returned verdicts of guilty as charged' on all counts against Defendant on November 6, 2015. The trial court heard and denied Defendant’s motion for new trial on November 18, 2015.- Immediately thereafter, after waiving delays, the court sentenced Defendant on count one (racketeering), to 50 years imprisonment at hard labor; count two (conspiracy to distribute co-. caine), 15 years imprisonment at hard labor; count three (conspiracy to distribute heroin),[37]. 50 years ■ imprisonment at hard labor without benefit of | ¡¡¡¡probation or suspension of sentence; on each of counts fifteen and eighteen (felon in possession of a firearm), 20 years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence and a $5,000 fine; count sixteen (illegal possession of a stolen firearm), five years imprisonment in the custody of the Department of Corrections; and count nineteen (possession with intent to distribute cocaine), 30 years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence for the first two years of the sentence. The court further ordered the sentences .imposed on counts one,- two, *388 three, and nineteen to run concurrently with each other and the sentences imposed on counts fifteen and eighteen be served consecutively to each other and consecutively to counts one, two, three, and nineteen. Also, with respect to count sixteen, the court ordered that the sentence be served concurrently to count fifteen, but consecutively to all other counts.
On November 30, 2015, the State filed a habitual offender bill of information on count one alleging Defendant to be a second felony offender. A hearing was held on the habitual offender bill on December 11, 2015, after which the trial court adjudicated Defendant to be a second felony offender On January 19, 2016, the trial court vacated Defendant’s sentence on count one and re-sentenced Defendant as a second felony offender, pursuant to La. R.S. 15:529.1, to 75 years imprisonment at hard labor. The court further ordered Defendant’s enhanced sentence on count one to run concurrently to his sentences on counts two, three, and nineteen and consecutively to his sentences on counts fifteen, sixteen, and eighteen.
On November 17, 2015, Defendant filed a motion for appeal,[38] which was | ^granted by the trial court following his resentenc-ing on count one on January 19, 2016. The instant appeal follows.
ASSIGNMENTS OF ERROR
On appeal, Defendant alleges the trial court erred in denying his motion to suppress the evidence obtained pursuant to the federal telephone wiretaps, and the trial court erred in denying his motion to sever his trial from that of co-defendant Smith.
LAW AND ANALYSIS
Denial of Motion to Suppress
Defendant argues the trial court erred in denying his motion to suppress evidence obtained pursuant to the lawful issuance of federal wiretaps, which did not comply with the Louisiana Electronic Surveillance Act’s requirements for issuance of a wiretap. Specifically, Defendant contends that federal authorizations for electronic intercepts are not approved by a judge or “attorney for a governmental entity,” as required under Louisiana law. He further maintains that while federal wiretap requirements do not mandate the presentation of confidential informants to the issuing judicial authority for determination regarding credibility and reliability, the Louisiana state statute does require the informant(s) to be presented to the issuing judge. Accordingly, Defendant submits that because of the State’s failure to comply with the Louisiana rules governing the interception of electronic and wire communications, the evidence obtained through federal orders authorizing such interception should have been deemed inadmissible. Defendant concludes that the Louisiana statute makes clear that evidence obtained in violation of the rules governing the interception of electronic and wire communications cannot be entered into evidence at trial. Thus, Defendant maintains that any evidence derived from the federal wiretap should be deemed “fruits of the poisonous tree” and, therefore, should have been excluded from evidence.
| s/The State responds that the procedures set forth in Louisiana’s wiretap statute, La. R.S. 15:1310—which' Defendant contends were not followed in the instant *389 matter—were adopted to allow state law enforcement officers to obtain wiretap orders from state judges as explicitly authorized by 18 U.S.C. § 2516(2) and do not impact the legality of federal wiretap orders obtained in this case in compliance with the federal wiretap procedure requirements.
On September 2, 2015, Defendant filed a “Motion for Disclosure of Electronic Surveillance, For a Pre-Trial Hearing, to Suppress Evidence and to Dismiss the Indictment.” On October 8, 2015, the trial court heard and denied Defendant’s motion to suppress wiretaps. In his motion and at the motion to suppress hearing, Defendant argued the federal wiretap warrants used to obtain electronic surveillance on his telephone, while procured in compliance with federal law, did not comport with the requirements set forth by the State of Louisiana under its Electronic Surveillance Act and, therefore, should be deemed inadmissible in a Louisiana state court proceeding. Defendant cited two examples in which he believed the federal wiretap warrants did not conform to the requirements of La. R.S. 15:1301-, et seq. First, he claimed-that the Louisiana act requires the signature of a state court judge for the authorization of a wiretap and not a federal judge as obtained on the wiretaps in this case; second, he claimed the federal authorization for the wiretaps did not comply with Louisiana law governing statements of informants and the requirement that any informant used in an applicatioñ be presented to the issuing judge.
At the hearing, the State acknowledged that had the wiretap been authorized by a state court judge, the informants would have been required to be presented for questioning; however, such requirement is unnecessary when obtaining a wiretap from a federal court judge as occurred in this case. The State maintained that the federal government obtained a valid authorization for the wiretaps to be used in lathis case, having met all procedural requirements mandated by federal law. It further noted that La. R.S. 15:1310(H) provides that an aggrieved party against whom intercepted recordings are intended for use at trial may move to suppress the recordings on three grounds: 1) the communication was unlawfully intercepted; 2) the order of authorization and approval under which it was intercepted is invalid on its face; or 3) the interception was not made in conformity with the order of authorization. Thus, because Defendant argued under the first basis, namely that the communication was unlawfully intercepted, the State argued Defendant’s motion should be denied due to the interceptions having been obtained pursuant to a lawful warrant signed by a federal judge after having reviewed a fact-intensive affidavit in support.
The trial court agreed with the State, finding that the intercept was lawfully obtained pursuant to federal wiretap mandates and that there had been no case law presented to indicate that “a lawfully intercepted wiretap could not be used in a state court prosecution.”
In a hearing on a motion to suppress, the State shall have the burden of proof in establishing the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant. La. C.Cr.P. art. 703(D); State v. Rogers, 09-13 (La. App. 5 Cir. 6/23/09); 19 So.3d 487, 493, writ denied, 09-1688 (La. 4/9/10); 31 So.3d 382. A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent abuse of that discretion. State v. Lee, 05-2098 (La. 1/16/08); 976 So.2d 109, 122, cert. denied, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008); Rogers, supra.
*390 The area of electronic. surveillance is governed by federal law. The Federal Wiretap Act, 18 U.S.C. § 2510, et -seq,, was first enacted as part, of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and was later substantially amended by the Electronic Communications Privacy Act of 1986, See Pub.L. 90-|a(i351, 82 Stat. 212 (1968); Pub.L. 99-508, 100 Stat. 1848, 1851 (1986). This Chapter of the United States Code strictly regulates the interception and derivative use of certain protected communications, and provides criminal, civil, and evidentiary sanctions for the violation of its provisions. Id. It also allows certain express exceptions to its prohibition of the interception and use of protected communications, among which is a, procedure by which specified federal officials may obtain, under, .limited circumstances, a, judicial wiretap .order authorizing surveillance, of protected communications. See 18 U.S.C. §§ 2517,2518.
The Federal Wiretap Act also contains express authority for the states to adopt “little wiretap” acts authorizing their law enforcement personnel to obtain similar wiretap orders from state judges. See 18 U.S.C. § 2516(2); State v. Neisler, 94-1384 (La. 3/16/95); 655 So.2d 252, 267, reversed in part on other grounds, (La. 1/19/96); 666 So.2d 1064. Pursuant to Title III, 18 U.S.C.A. § 2516(2), states are authorized “to adopt coordinate statutes permitting the interception of wire, oral, or electronic . communications and to grant greater, but not lesser, protection than that available under federal law.” Commonwealth v. Spangler, 570 Pa. 226, 231-32, 809 A.2d 234 (2002). See also Bishop v. State, 241 Ga.App. 517, 526 S.E.2d 917 (1999); Commonwealth v. Barboza, 54 Mass.App.Ct. 99, 763 N.E.2d 547 (2002). A state court may construe the procedural requirements of its electronic surveillance law more strictly than federal, courts, thereby giving added meaning to the state’s constitutional or statutory guarantee of privacy. James Q., Carr, The Law of Electronic Surveillance, § 2.4(a) (2002).
A majority of jurisdictions, including Louisiana, have followed the federal government and enacted electronic surveillance statutes patterned after Title III. Louisiana’s Electronic Surveillance Act, La. R.S., 15:1301, et seq., like the Federal Wiretap Act, makes unlawful the interception and disclosure of “wire,” “electronic,” or “oral” communications, as these terms are defined in the act, by b/any person.” La. R.S. 15:1303(A). In the case of an “unauthorized (unlawful) interception of such communications, civil and criminal sanctions,,as well as an evidentiary exclusionary provision, comprise the remedies available to ‘aggrieved’ parties.” Neisler, 655 So.2d at 258. The exclusionary remedy provides that “[wjhenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in. evidence in any trial, hearing, or other proceeding.” See La. R.S. 15:1307(A).
However, Louisiana’s Act, like its federal counterpart, contains several exceptions to its blanket prohibition of the interception of protected communications. Specifically, La. R.S. 15:1308 allows the attorney general, or the district attorney in whose district the interception will-take place, to authorize an application to a state judge for an order approving the interception for the investigation of certain crimes, including violations of the Uniform Controlled Dangerous Substance Act, La. R.S. 40:961, et seq., under which defendants in this case have been charged.
In order to obtain a wiretap under the act, a specified procedure must be followed. See La. R.S. 15:1310(A)-(G). In this case, Defendant argues that the state pro *391 cedure concerning the presentment of the confidential informants used as a basis for obtaining the wiretap was ignored. In particular, La. R.S. 15:1310(B) states:
If statements of an identified or unidentified informant are relied upon in the application as a basis for establishing .that there are reasonable grounds to believe that an offense has been, is being, or is about to be committed, the application shall set forth the factual basis for the affiant’s belief that the informant is credible and that the information has been obtained in a reliable manner. The informant shall he presented to the judge and he sworn to afford the judge opportunity to inquire if the statements made in the application are true. The application shall so state that the informant was presented to the judge and sworn for such purpose. This provision shall not affect the privileged character of the identity of an informant. Nothing | ^herein shall be construed to require the identification of a confidential informant, (emphasis added).
La. R.S. 15:1310(B)
The validity of a wiretap order may be challenged in a motion to suppress the evidence obtained from that order. The state act delineates three scenarios when a motion to suppress may lie: (1) the communication was unlawfully intercepted; (2) the order of authorization or approval was facially insufficient; or (3) the interception was not made in conformity with the order of authorization or approval. La. R.S. 15:1310(H)(1). If any of these grounds are established by the “aggrieved” party, all evidence obtained from the wiretap order must be suppressed in accordance with La. R.S. 15:1307.
As previously mentioned, this case arose from a federal investigation conducted by a task force into drug trafficking in Jefferson Parish that resulted in federal and state indictments. Here, Defendant concedes that the wiretaps in this case were lawfully obtained under federal law. However, Defendant argues their invalidity based on the failure to follow state law. He - maintains, under the first enumerated scenario, that the communication was unlawfully intercepted, having failed to comply with the procedural mandates set forth under Louisiana’s Act, In particular, he cites to La. R.S. 15:1302(13) and 15:1310(B)(1), alleging the government’s failure to obtain a state court judge’s authorization for the wiretap, and the failure to present the informants used in the affidavit to the judge who issued the wiretap order, in support of the suppression of the wiretap evidence. However, because the wiretap orders in this case were issued by a federal judge under federal law having complied with all the necessary federal procedural mandates for a lawful intercept, the better question is whether a lawfully intercepted federal wiretap can be used in a state court prosecution. The trial court answered this question in the affirmative, finding no law to the contrary. Had the l29wiretap orders been sought and issued with the alleged deficiencies in state court pursuant to the Louisiana Act, a valid argument could potentially be made regarding their suppression.[39] However, this is not the case here.
*392 On its face, the Louisiana wiretap law does not prohibit the use of federally obtained wiretap evidence. However, in the absence of Louisiana jurisprudence on point, a look towards other jurisdictions for guidance is warranted.
In State v. Minter, 116 N.J. 269, 561 A.2d 570 (N.J. 1989), federal agents conducted an investigation in accordance with federal wiretap law and intercepted a telephone call that would have been admissible in a federal court proceeding. The federal agents, however, did not follow the procedures demanded of state agents under New Jersey’s wiretap law. Id. at 271, 276, 561 A.2d 570. The court noted that the failure of a state agent to comply with state law results in the exclusion of the evidence in a state prosecution. Id. at 278-79, 561 A.2d 570. Nevertheless, respecting the notion of federalism, the New Jersey Supreme Court held that since the state guidelines did not explicitly prohibit the use of independently obtained federal wiretap evidence, and the enforcement of the state guidelines to exclude the evidence would not further privacy interests, the evidence need not be excluded. Id. at 282, 561 A.2d at 577.
In reaching its conclusion, the Minter court sought guidance from other jurisdictions that have resolved the “evolving problems of federalism attendant to | ^differing state and federal views concerning the validity of searches.” Id. at 279, 561 A.2d 570. The New Jersey court cited to the Minnesota Supreme Court, in State v. Lucas, 372 N.W.2d 731 (Minn. 1985), indicating that an exclusionary-rule analysis would serve both to deter unlawful conduct and to vindicate fundamental state guarantees. Thus, using that analysis, the court opined “absent participation by State officers in the search, no principles or policies of the exclusionary rule would call for the categorical exclusion from state court proceedings of wiretap evidence that has been obtained by federal officers in accordance with federal law but not state wiretap requirements.” Minter, 116 N.J. at 280, 561 A.2d 570. The court further reasoned that excluding wiretap evidence independently obtained by federal agents would not “deter unlawful conduct” because they lawfully obtained a federal wiretap under authorizing federal law. Id., 116 N.J. at 280-81, 561 A.2d 570. However, the case was ultimately remanded for determination of whether cooperation between state and federal officers was of such extent that the federal officers’ failure to comply with the Act required exclusion of the wiretap evidence because it was obtained for the purpose of a state prosecution and, thus, unlawfully inter *393 cepted under New Jersey Wiretap Law.[40]
In the instant matter, we also reason that absent state guidelines to the contrary, exclusion from state court proceedings of wiretap evidence obtained lawfully by federal officers in accordance with the federal wiretap act would not promote the principles of the exclusionary rule. Thus, respecting the notion of federalism, and the consideration that exclusion of the evidence would not further the privacy interests of the citizens of the State of Louisiana, we find the trial court properly determined the evidence need not be excluded. Accordingly, the trial court did not abuse its discretion in denying Defendant’s motion to suppress.
Denial of Motion to Sever
|aiIn his second assignment of error, Defendant contends it was an abuse of discretion for the trial court to require him to proceed to trial jointly with his codefen-dant who was charged with the homicide of Donte Hall, in which Defendant had no involvement, and otherwise in which given the great number of counts in the indictment, the likelihood of confusion and prejudice was great.
The State responds that Defendant has waived any alleged trial court error on this issue when he failed to move for a severance based upon the elicitation of testimony concerning the killing of Donte Hall. Alternatively, the State maintains that Defendant failed to carry the burden of establishing that evidence concerning the second degree murder of Hall by co-defendant Smith, an Enterprise member, required a severance. It further submits that while the length of the entire trial was held over nine days, the testimony concerning Hall’s murder was neither so lengthy nor so complex as to confuse the jury or render it unable to segregate the evidence.
On the morning of the first day of trial, discussions were had amongst the parties regarding the reading of the indictment. The State and co-defendant’s counsel agreed to the reading of the indictment in its entirety, however, Defendant’s counsel indicated that he desired the portions of the indictment that did not pertain to Defendant be excised to avoid any prejudice to him. In particular, Defendant’s counsel went on to state that he believed there existed a “conflict” among Defendant and co-defendant “to the extent that our interests involve not having the indictment read in its entirety and only having those portions that apply directly to Mr. Williams being brought to the attention of the jury.” Thus, Defendant’s counsel moved for a severance “based upon the conflict of interest between the two co-defendants.” The trial court concluded that the law required the indictment be read in its entirety and denied Defendant’s motion to sever.
IsgTrial commenced with the testimony of the State’s first witness, FBI Special Agent Schliem. During his testimony, co-defendant’s counsel moved for Smith to be severed from Defendant claiming that Defendant’s cross-examination of Special Agent Schliem established antagonistic defenses among Defendant and codefendant Smith. Defendant joined in the motion, advising, “I think that there may be other times when I may have to say some things or ask questions that may cast a negative light on Mr. Smith.” The trial court again denied the motion to sever, finding that nothing had yet to be presented “that would cast any negative issues” on co- *394 defendant, “beyond what the State has already placed on the record.”[41]
At the outset, as noted by the State, Defendant has failed to preserve the contested issue for review. The record contains neither a written nor oral motion to sever based upon testimony concerning the murder of Hall. In order to preserve the right to appellate review of an alleged trial court error, a party must state an objection contemporaneously, with the occurrence of the alleged error, as well as the grounds for the objection. State v. McClain, 04-98 (La. App. 5 Cir. 6/29/04); 877 So.2d 1135, writ denied, 04-1929 (La. 12/10/04); 888 So.2d 835. A new basis for an objection may not be raised for the first time on appeal. Id. Accordingly, Defendant’s claim has not preserved for review.
Nevertheless, in the interest of justice, we will review the merits of Defendant’s assignment of error. Defendant moved for a severance from his codefen-dant and not a severance of the offenses. La. C.Cr.F. art. 704 provides the following regarding severance:
Jointly indicted defendants shall be tried jointly unless:
(1) The. state elects to try them separately; or
lss(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied, ' that justice requires a severance.
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, 741 (La. 1984); State v. Foret, 96-281 (La. App. 5 Cir. 11/14/96); 685 So.2d 210, 224. A defendant is not entitled to, a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court. State v. Cedrington, 98-253 (La. App. 5 Cir. 12/16/98); 725 So.2d 565, 577, writ denied, 99-0190 (La. 6/4/99); 743 So.2d 1249. A denial of a motion to sever will not be overturned absent a clear abuse of discretion. Prudholm, 446 So.2d at 741.
A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent’ that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State. Prudholm, 446 So.2d at 741; Cedrington, 725 So.2d at 577, The defendant bears the burden of proof in a motion to sever. State v. Jackson, 03-883 (La. App. 5 Cir. 4/27/04); 880 So.2d 841, 851-62, writ denied, 04-1399 (La. 11/8/04); 885 So.2d 1118.[42] The mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. State v. Coe, 09-1012 (La. App. 5 Cir. 5/11/10); 40 So.3d 293, 301-02, writ denied, 10-1245 (La. 12/17/10); 51 So.3d 17. For defendants to be entitled to separate trials, prejudice must be shown. Jackson, 880 So,2d at 852. Antagonistic defenses are not the only instances where the denial of a motion to sever will constitute an abuse of discretion. Where the ends of justice will be best served by severance, it should be granted. *395 Cedrington, 725 So.2d at 577-78 (citing State v. Webb, 424 So.2d 233 (La. 1982)).
I ¡^Prejudice may occur in a joint trial “when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a co-defendant.” Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (citing Bruton v. United States, 391 U.S. 123, 88 S.Ct 1620, 20 L.Ed.2d 476 (1968)).
In Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Supreme Court commented that joint trials play an important role in the criminal justice system, as they promote efficiency and serve the interest of justice by avoiding the inequity of inconsistent verdicts. The Zafiro Court found that' severance is not mandated ' whenever co-defendants have conflicting defenses, even if a defendant is prejudiced by the joinder. It is up to the district court’s discretion to tailor the relief, if any, to be granted to the prejudiced party;
The Zafiro Court commented that when defendants have been properly joined, a district court should grant a- severance only when a specific trial right of one of the defendants might be compromised, or where there is a risk that the jury will arrive at an unreliable verdict. “Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.” Zafiro, 506 U.S. at 534, 113 S.Ct. at 935; see also State v. Johnson, 96-0959 (La. 6/28/96); 675 So.2d 1098.
At trial in the present case, there was no reference to conflicting interests between Defendant and his co-defendant Smith nor were their defenses antagonistic to one another. Neither Defendant nor co-defendant blamed one another for the respective crimes for which they were charged. In fact, based on the testimony established .at trial, they possessed such separate and distinct roles in the alleged- drug trafficking enterprise that neither Defendant nor co-defendant could shift the blame from one to the other. The mere allegation of conflicting | ¡^interests between co-defendants does not constitute mutually antagonistic defenses requiring severance. State v. Lewis, 11-1000 (La. App. 5 Cir. 5/22/12); 96 So.3d 1211, writ denied, 12-1480 (La. 11/21/12); 102 So.3d 55. Moreover, Defendant has not shown how he was prejudiced by the lack of a severance. In Foret, 685 So.2d at 224, this Court found that “justice does not require severance where only the extent of participation of each defendant is at issue.” Thus, the fact that Defendant- did not participate in the murder of Donte Hall, a charge for which only his co-defendant was indicted, was not a consideration for the trial court in determining whether a severance was required.
Also, Defendant and co-defendant were charged in a 30-count indictment for various crimes stemming from a criminal drug enterprise amongst numerous co-conspirators in Jefferson Parish. At trial, over 40 witnesses testified regarding the charged offenses. The numerous witnesses and overlapping nature of the charges surrounding the wrongdoings by the criminal enterprise in this case necessitated the joint trial of Defendant and his co-defendant, so as to present a cohesive narrative for the jury. Piecemeal, litigation is not sanctioned by the courts and, where the same witnesses would be called to'testify, judicial economy dictates that there be one trial. Warren v. Bergeron, 599 So.2d 369 (La App. 3 Cir. 1992), cert. denied, 604 So.2d 995 (La. 1992). Accordingly, we find the trial court did not abuse its discretion in denying Defendant’s motion to sever.
*396 Errors Patent Discussion
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La. App. 5th Cir. 1990).
In the original commitment[43] there is a discrepancy with the transcript. The | ¡y,original commitment states that Defendant’s five-year sentence on count sixteen is to be served concurrently with count one, when the trial court ordered that it be served concurrently with count fifteen.[44]
If a discrepancy exists between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La. 1983). As such, we choose to remand the matter for correction of the commitment for accuracy purposes, and further direct the trial court to make the entries in the commitment reflecting this change and direct the Clerk of Court to transmit the original of the minute entry to the officer in charge of the institution to which the defendant has been sentenced and to the Department of Corrections’ Legal Department. See La. C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La. 9/15/06); 937 So.2d 846 (per curiam).
Next, Defendant was convicted, on count two, of conspiracy to distribute cocaine, violations of La. R.S. 40:967(A) and La. R.S. 40:979. Sentencing under La. R.S. 40:967(B)(4)(b) and La. R.S. 40:979(A) require “the first two years” of the sentence to be served without benefit of parole, probation, or suspension of sentence. In this case, when the trial judge sentenced Defendant on count two, he did not specify that the first two years of Defendant’s 15-year sentence was to be served without benefit of parole, probation, or suspension of sentence. Thus, Defendant received an illegally lenient sentence. However, the tidal court’s failure to state this requirement at sentencing need not be corrected on remand because under State v. Williams, 00-1725 (La. 11/29/01); 800 So.2d 790, 799 and La. R.S. 15:301.1 (A), the “without benefits” provision is self-activating.[45]
|a7Also, Defendant’s enhanced sentence on count one was imposed without restrictions in violation of La. R.S. 15:529.1(G), which requires an enhanced sentence under the habitual offender laws to be imposed without the benefit of probation or suspension of sentence. Further, “the restrictions on parole eligibility imposed on multiple offender sentences under La. R.S. 15:529.1 ‘are those called for in the reference statute.’” State v. Tate, 99-1483 (La. 11/24/99); 747 So.2d 519, 520 (per curiam) (citing State v. Bruins, 407 So.2d 685, 687 (La. 1981)). Thus, because Defendant’s underlying conviction for racketeering (count one) does not restrict *397 parole, the trial court was only required to impose Defendant’s enhanced sentence without probation or suspension of sentence. However, under La. R.S. 15:301.1(A) and the rationale in Williams, supra, the restrictive provision of La. R.S. 15:529.1(G) is self-activating, thus making corrective action unnecessary.[46] See State v. McKenzie, 09-893 (La. App. 5 Cir. 2/15/11); 61 So.3d 54, 61.
Additionally, while the transcript reflects that the trial court vacated Defendant’s original sentence on count one prior to imposing his enhanced sentence, the habitual offender commitment does not reflect that his original sentence was vacated. If a discrepancy exists between the minutes and the transcript, the transcript prevails. Lynch, supra. Thus, we remand the matter for correction of the habitual offender commitment for accuracy purposes and further direct the trial court to make the entries in the habitual offender commitment reflecting this change and direct the Clerk of Court to transmit the original of the minute entry to the officer in charge of the institution to which the Defendant has been sentenced and to the Department of Corrections’ Legal Department. See La. C.Cr.P. art. 892(B)(2); Roland, supra.
LsThere is also a discrepancy between the habitual offender uniform commitment order and the transcript with respect to the restriction of benefits on Defendant’s enhanced sentence. The habitual offender uniform commitment order indicates “120 Years of the sentence to be served without benefit of probation or suspension.” This is inconsistent with the transcript because Defendant was sentenced to an enhanced sentence of 75 years; thus, 75 years of the sentence is to be served without benefit of probation or suspension of sentence and not 120 years.
Also, the habitual offender commitment is unclear as to whether his enhanced sentence was ordered to be served concurrent or consecutive to his original sentences, despite the fact that the transcript reads that his enhanced sentence “shall run concurrently with his sentence in Counts 2, 3 and 19 in matter number 15-1144 and shall run consecutively to Counts 15,16 and 18 in 15-1144.”
If a discrepancy exists between the minutes and the transcript, the transcript prevails. Lynch, supra. This Court has previously remanded a case for correction of the commitment and the uniform commitment order in its error patent review. State v. Long, 12-184 (La. App. 5 Cir. 12/11/12); 106 So.3d 1136, 1142.
Accordingly, we remand this matter and order that the uniform commitment order be corrected to reflect the proper sentence handed down by the trial court with regard to the number of years of imprisonment Defendant was sentenced to as a habitual offender on count one and order that the commitment be corrected to clarify the consecutive and/or concurrent nature of the enhanced sentence. Further, we direct the Clerk of Court for the 24th Judicial District Court to transmit the *398 original of the corrected- commitment and uniform commitment order to the officer in charge of the institution to-which defendant has been sentenced and the Department of Corrections’ Legal Department. See Long, 106 So.3d at 1142 (citing La. C.Cr.P. art. 892(B)(2)).
DECREE
lasFor the foregoing reasons, Defendant’s convictions and sentences are affirmed. The matter is remanded to the trial 'court for correction of the uniform commitment order as directed in the opinion.
CONVICTIONS AND SENTENCES AFFIRMED; COMMITMENT REMANDED FOR CORRECTION
CONCURS WITH REASONS WITH WHICH WICKER, J. JOINS

. Co-defendant Alcus Smith’s appeal is pending before this Court under companion case number 16-KA-406.

. The indictment alleged the possession of two separate firearms on November 6, 2013 and November 18, 2013, respectively.

.Co-defendant Smith was charged with racketeering (count one), attempt or conspiracy to distribute cocáine (count two), second degree murder (count seventeen) and possession with intent to distribute cocaine (count nineteen).

. Criminal charges had not been brought in relation to these murders; however, several suspects were developed, including the Hudson brothers and Paul Smith.

. Steven Collins testified that in 2012 he owned a firearm that was stolen from the glove compartment of his vehicle. He stated that he reported the gun stolen and provided the police with its serial number. Mr. Collins further indicated that Defendant did not have his permission to take or possess his firearm at any time.

. Smith’s statement “like last time,” references an earlier November 8, 2013 wiretap conversation between Sonnier and Carter regarding a meeting in front of the "Dale,” which Special Agent Schliem believed to be a reference to the Scottsdale neighborhood.

. Based upon his investigation, Special Agent Schliem believed "work your magic" to mean "someone that would take powder cocaine and cook it in the—in a, cocaine base, or crack cocaine,"

. Agent Boudreaux testified that he was able to identify Sonnier and Defendant from prior surveillances where he had observed the pair at various meeting locations engaging in activity consistent with narcotics trafficking.

. Agent Boudreaux testified that Defendant was'dressed in all red, and is “quite short,” so he was "very observable when he walked up to the rest of the group."

. 'Defendant was standing a few feet away and within hearing distance of their conversation.

, Chemical testing revealed that the substance was synthetic marijuana.

, Pamela Williams-Cyprian of the JPSO Crime Laboratory testified as an expert in the identification and analysis of controlled dangerous substances. She testified that the contraband found inside the Mazda and along the route driven by the Mazda tested positive for cocaine, and State’s Exhibit 29 tested positive for a synthetic cannabinoid called AB-Fubi-naca aka "mojo.” She further testified that State's Exhibit 28 contained two different types of "mojo” (AB-Pinaca and AB-Fubina-ca).

, Motton was in possession of the key to the Mazda at the time of his arrest.

. ' Donna Quintanilla of the JPSO Crime Laboratory testified as an expert in latent fingerprint comparison and analysis, Ms. Quintanil-la told the jury that she matched Defendant's fingerprints to those affixed to certified court records for a 2001 conviction for simple burglary and a 2006 conviction for possession of a firearm by a convicted felon, -

. The confidential informant was identified as Nicole Newton, Her identity was revealed because she was suffering from terminal cancer. Marcel Folse of the JPSO Crime Laboratory testified as an expert in the analysis and identification of controlled dangerous substances. Folse testified the narcotics used in *380 the undercover buys tested positive for cocaine.

.Special Agent Schliem testified that the . term/'racks” is a word used in the "drug world for increment[s] of $1,000.”

. Special Agent Schliem testified that "Bull” is co-defendant Smith’s nickname.

. Defendant is depicted wearing a chain with the letters "HH” around his neck.

. Richardson stated that he hoped his .testimony would result in a reduction of his sentence.

. Richardson defined “slabs” as costing $50, which he would then break down into “rocks” and sell them'for $10 to $20 per rock.

, Reynard also stated that he hoped his testimony would result in a reduction of his sentence.

. Co-defendant Smith told Sergeant Nance that the vehicle belonged to Nathan Carter.

. Michael Cole of the JPSO Crime Laboratory testified as an expert in the analysis and identification of controlled dangerous substances and told the jury that State’s Exhibit 77 tested positive for cocaine and contained a total net weight of approximately 71/2 kilograms.,

. Holmes testified that he would travel to Houston to retrieve the narcotics approximately five or six times per month.

.Holmes indicated that in November of 2013, co-defendant Smith was living in the St. Germaine apartment complex but that he would pick up'the money for the narcotics from Smith at a house on Friendship Drive in Harvey in the months leading up to their April 2014 arrest. At times the quantity of money exceeded $200,000.

. Special Agent Schliem also identified a music video entitled "Every Snitch/' depicting David Williams aka “Mr. Harvey,” Tory Richardson, Kentaz Gay den aka "Kenny Boo,” Paul Smith aka "Buck,” Carlnell Pierce, Tedrick Reynard, and Chad Jones.

. Kerry Walker, records custodian for Sprint Corporation, provided phone records for telephone number (504) 236-7867, belonging to Donte Hall.

. Smith paid the rent and security deposit for the apartment.

. Ms. Toussaint leased the apartment from April 30, 2013 until March 1, 2014.

. On cross-examination Bird admitted that he was originally brought in for questioning as a suspect in Hall’s murder because of the similarities between his vehicle and the white car seen following the black Infiniti.

. Maya's mother, Marshanda Jackson, testified that on the day before Hall was murdered, she saw him enter Smith's car, remain inside for approximately seven to ten minutes, and then exit the car, She further testified that on the day of Hall's murder, her daughter Maya reported to her that Hall had left the neighborhood with Smith and that a "white car went flying behind them.”
Jeanine Gonzales also testified that while driving on Lafitte Highway, a black vehicle followed by a white vehicle passed her at a very high rate of speed.

. Detective Travis Es'erman testified that there were 56 phone calls between the phone number associated with codefendant Smith’s and Hall’s phone numbers between November 14, 2013 and Hall’s death on November 16, 2013. In the same period, there were also 26 phone calls between co-defendant Smith and Carter.

. On April 25, 2016,-the State dismissed this charge against co-defendant Smith.

. Robinson had not been sentenced as of the time of trial and hoped his cooperation in providing his testimony in this matter would be taken into consideration at the time"'of sentencing.

.According to Detective Roniger, a surveillance video dépicting the interior and exterior of the daiquiri shop where Bullock was murdered contained footage of Robinson shooting Bullock. It also contained footage of Defendant inside the daiquiri shop prior to the murder.

. Three young children in the apartment were also shot.

. Defendant was charged in count three with conspiracy to distribute heroin and cpn-spiracy to distribute marijuana and was found guilty of both of these crimes. The trial court originally sentenced Defendant for both of these crimes but then realized his error and vacated the sentence on the conspiracy to distribute marijuana conviction, leaving only the sentence on his conspiracy to distribute heroin conviction. ¡ >-. r.

. On the written motion for appeal, the trial court indicated that it would sign the motion after the habitual bill proceedings.

. See State v. Neisler, 94-1384 (La. 1/18/96); 666 So.2d 1064, where, on original hearing, the Louisiana Supreme Court suppressed evidence obtained from wiretaps because the officers failed to comply with the state Act’s mandatory requirement that the officers present their confidential informant to the issuing judge. See State v. Neisler, 655 So.2d 252 (La. 1995). On rehearing, the court recognized that the officers technically violated the state Act. Neisler, 666 So.2d at 1068. The court held,, however, that "the necessity for suppressing evidence under the exclusionary rule of Section 1307 is an entirely separate ques *392 tion.” Id. The court further held, “[t]he crucial issue becomes whether evidence must be suppressed ... in every case of a failure to follow every statutory requirement [of the pertinent section of the state Act] in obtaining a wiretap order.” Id, In reversing its prior holding, the court relied on case law in which the court had recognized that a search warrant may be valid even when the supporting affidavit contained inaccurate information, if suppressing the evidence would not deter deliberate and fraudulent police behavior. Id. (citing State v. Rey, 351 So.2d 489 (La. 1977)). The Neisler court concluded that it must arrive at a "reasonable and just accommodation between an accused's interest in limiting invasions of his or her privacy to those based upon a magistrate’s determination of probable cause and society's interest in using reliable evidence to convict those who violate criminal laws.” Id. (citing State v. Lehnen, 403 So.2d 683, 686 (La. 1981)). Finally, in affirming the court of appeal's decision not to suppress the evidence, the court stated that suppression "is simply too high a price to pay to assure technical compliance with a statute whose purpose was otherwise served by the commendable police work in the present case.” Neisler, 666 So.2d at 1069.

. In the matter at bar, Defendant did not allege or present any evidence of any collusion between the federal and state agents. Thus, unlike the New Jersey court, we decline to remand the case for any further inquiry on that issue.

. Despite allegations to the contrary, a, reading of Defendant’s cross-examination of Special Agent Schliem does not establish antagonistic defenses among Defendant and co-defendant; rather, as the trial court stated, it merely sets forth the facts brought out by the State on direct examination regarding the intercepted telephone calls involving codefen-dant Smith.

. "When a severance is sought before trial, the standard for obtaining a severance is broader because of the speculation as to what the .trial evidence will actually be; and after trial commences, the standard is stricter because at that time the trial judge is able to analyze the evidence which has actually been admitted.” Foret, 685 So,2d at 224 n.9.

. The record in the instant case contains two commitments. The original commitment pertains to Defendant's original sentencing, while the multiple offender commitment pertains to Defendant’s enhanced re-sentencing on count one.

. It is noted that the Uniform Commitment Order is silent and does not reflect the concurrent nature of counts fifteen and sixteen.

. Notably, despite the trial court’s failure to impose the requisite statutory restrictions when sentencing Defendant on count two, both the original commitment and the uniform commitment order correctly state that the first two years of Defendant's 15-year sentence on count two is to be served without benefit of probation, parole, or suspension of sentence. As discussed, because the “benefits provision” is self-activating, this discrepancy accurately reflects the restrictions that should have been imposed and, thus, need not be corrected.

. Despite the trial court’s failure to restrict probation and suspension of sentence on defendant’s enhanced sentence, the habitual offender commitment accurately states that Defendant’s enhanced sentence is to be served without benefit of probation or suspension of sentence. As discussed, because the "benefits provision” is self-activating, this discrepancy should not be corrected because the commitment accurately reflects the restrictions mandated by law. Also, when imposing Defendant’s sentence, the trial court did not suspend Defendant’s sentence or place him on probation, thus, the issue is moot.